The Crowell-Collier Publishing Company v. Commissioner.
Crowell-Collier Publ. Co. v. Commissioner
Docket No. 40202.
United States Tax Court
1956 Tax Ct. Memo LEXIS 231; 15 T.C.M. (CCH) 326; March 19, 1956
*231 The issues involved in this proceeding have to do with petitioner's claims for relief and refunds under sections 722(b)(4), 721(a)(2)(C), and 711(b)(1)(J) and (K), Internal Revenue Code of 1939. The taxable years involved are 1943, 1944, and 1945. The issues will be stated in detail in the opinion. Jay O. Kramer, Esq., Gilbert I. Falk, Esq., and Josiah Willard, Esq., for the petitioner. Arthur N. Mindling, Esq., and John A. Clark, Esq., for the respondent. Findings of Fact 1. The stipulated facts are hereby found. 2. Petitioner, a Delaware corporation, has its principal office at 640 Fifth Avenue, *232 New York, New York. Its returns for the calendar years 1943, 1944 and 1945 were filed with the collector of internal revenue, third New York district, New York, New York. Petitioner was incorporated on May 25, 1920, as The Crowell Publishing Co. On June 30, 1934, P. F. Collier & Son Co., which had been organized in 1919, was merged into The Crowell Publishing Co. In May 1939, petitioner's name was changed to The Crowell-Collier Publishing Co. 3. Petitioner's principal business has always been the publication and sale of magazines. At the beginning of the base period the magazines published by petitioner were Collier's, The National Weekly, Woman's Home Companion, The American Magazine, and Country Home. 4. Petitioner also had income from dividends from subsidiary corporations, sale of sets of books which had been printed by others, and the sale of miscellaneous booklets on needlecraft, embroidery, etc., in connection with the Woman's Home Companion. 5. Petitioner published all the abovenamed magazines throughout the base period. The last issue of Country Home which petitioner ever printed was the December 1939 issue. 6. As subsidiary corporations petitioner had P. F. Collier *233 & Son Corporation, which, together with its predecessor, petitioner controlled since 1919; The Hanson-Bennett Magazine Agency, Inc., which, together with its predecessor, petitioner controlled since 1916; Periodical Sales Co., Inc., which, together with its predecessor, petitioner controlled from 1934 to 1944; and Reynolds Publishing Co., which petitioner controlled since 1919. 7. Petitioner filed separate income tax returns for 1936 to 1945, inclusive. It filed consolidated excess profits tax returns for 1940 and 1941 and included the operations of the above-named subsidiaries. Separate excess profits tax returns were filed for 1942 to 1945. 8. P. F. Collier & Son Corporation engaged in the sale of subscriptions to magazines published by its parent company, as well as to magazines published by others, and was also in the business of selling books in sets. Under its arrangement with petitioner during the base period years, the full cost of such books, printed and bound by others, was billed first to petitioner and then rebilled to the subsidiary, followed by a further billing to the subsidiary of an additional charge equal to 40 per cent of the petitioner's cost, which thus became *234 petitioner's gross profit on the books. 9. The principal business of Hanson-Bennett Magazine Agency, Inc., was the solicitation by catalogue of magazine subscriptions for both its parent company and other publishers. 10. Periodical Sales Company, Inc., also solicited subscriptions for both petitioner and other publishers on a "two-pay agency" operation, collecting a down payment from subscribers which covered a commission, and arranging for payment of the balance later. 11. Reynolds Publishing Company sold damaged books purchased from its parent company. 12. Petitioner's original applications for relief stated, with respect to gravure, as follows: "Statement in Support of Claim for Relief under Sec. 722, Internal Revenue Code. "1. Relief under Sec. 722(b)(2)
* * * "(b) Gravure Printing Costs: * * * "The taxpayer decided that before attempting to sell advertisers the new printing method it had to establish to their satisfaction the quality of color printing by this method. In order to do this they decided to print a large section of the editorial pages in gravure color, whereas previously black and white pages were predominent. The *235 taxpayer made no attempt to sell advertisers four-color gravure during the experimental years and only sold one four-color advertising page in the years 1936-39. "The expenses during the base period years were, therefore, considerably increased by this change in process, without the benefit of offsetting advertising receipts, not only by the outlays for Plant Alterations, etc., but also by the increase in the normal cost of manufacturing. The difference between the cost of printing gravure pages, against the cost of printing black and white pages, was considerable, as shown in the following exhibit and was a cost directly attributable to the changeover to the gravure process. "Extraordinary Expenses Incurred in Changing Over to Gravure Process
"Miscellaneous
Plant &
"Gravure
Moving
Building
Survey
Expense
Expense
Alterations
Expense
1936
$45,635
1937
2,398
$10,000
$48,022
1938
6,526
$30,821
28,522
6,886
1939
20,132
12,496
$74,691
$30,821
$51,018
$54,908
TOTAL
$211,438
"Change from Black and White Letter Press to Gravure Color
"Woman's Home Companion
Collier's Weekly
The American Magazine
1936
132 pages at $292
$38,544
72 X 48
$ 3,456
170 X 48
$ 8,160
1937
96 pages at 205
19,680
440 X 171
75,240
216 X 256
55,296
1938
552 X 55
30,360
87 X 288
25,020 *
1939
152 pages at 21
3,192
848 X 200
169,600
317 X 516
163,572
$61,416
$278,656
$252,048
*236 "The taxpayer claims that the cost of this change to gravure color printing during the base period years without any compensating income advantage during those years from advertising constituted a temporary economic event, unusual in the case of the taxpayer, which is a basis for relief under Section 722(b)(2). "2. Relief under Sec. 722(b)(4). * * * "(b) Gravure Printing Costs. "* * * it is similarly claimed that a change to gravure color printing described in paragraph 1(b) of Title 11 above constituted a 'change in the character of the business' within the meaning of Sec. 722(b), which entitles the taxpayer to relief thereunder. "3. Relief under Sec. 722(b)(5). * * * "(a) Extraordinary Publicity Expense. "During the four years 1936-39 the taxpayer made extraordinary expenditures for publicity. The average for the four years was $804,300 per year, or a total of $3,217,201. For the four years prior thereto, 1931-35, the total expenditure was only $1,877,619, or an average of $469,405 per year. The taxpayer maintains that this expenditure was abnormal to the extent of $1,339,582 for the four years and that consideration *237 should be given to this extraordinary expense in the sum of $1,339,582 as an addition to its profits for the years in question. The expenditure by years is set forth hereunder: 1931
$591,311
1932
380,600
1933
410,677
1934
405,561
1935
680,781
1936
787,682
1937
785,647
1938
727,892
1939
915,980
"(b) Cost of Circulation Overage. "The taxpayer started in 1936 and continued through 1937-38-39 to build up circulations with the object of securing higher advertising rates. In order to achieve this it was necessary to increase its circulation expenses and, in addition, to manufacture a great many more copies than were manufactured in 1935 or to fulfill the circulation guaranteed by the current advertising rate." 13. Petitioner's present claim that it was able to accomplish cost savings through the use of gravure printing was presented by the filing on October 7, 1948, of amended applications for relief on form 991 for 1943, 1944, and 1945. No reference was made to the original applications and the claim was made that there had been a decrease, rather than an increase, in expenses as a result of petitioner's use of gravure during the base period; and *238 no mention was made of extraordinary publicity expenses or of a depression in base period earnings by reason of excessive circulation overages. 14. "Second Amended" applications for relief were filed June 21, 1949, which stated that they superseded the previous applications for relief, but that all the supporting data filed with first amended application, not replaced in the second amended application, were to be considered a part of the second amended application. 15. Until his death in 1946 or 1947, at the age of about 83 years, petitioner's most important stockholder was Joseph P. Knapp, hereinafter referred to as Knapp. He was a dominating, positive, and forceful person, and exerted a strong influence over petitioner's top executives and board of directors, of which he was a member. He kept close track of and exercised his influence on all phases of petitioner's business. He had no marked ability as an editor, but sometimes attempted to fix basic editorial policy. His father, Joseph F. Knapp, was also a member of petitioner's board of directors for many years until 1942. Joseph F. Knapp was the founder of the Metropolitan Life Insurance Company, and both he and Knapp had substantial *239 wealth. Knapp's controlling stock, during the base period, was in two or more holding companies, including Publication Corporation, which owned about 26 per cent of petitioner's outstanding capital stock and a controlling interest in other corporations. Publication Corporation also owned and operated Alco Gravure, Inc. Publication Corporation was the successor of American Lithographic Company, another corporation controlled by Knapp. It had engaged in lithgoraphic printing in about 1904 and later did gravure printing with the same facilities later held by Alco Gravure, Inc. The assets used in lithographic printing had been sold to outside interests at a substantial profit shortly before the market crash of 1929. 16. Knapp never received compensation from petitioner for his services, nor did he charge it for any of his expenses. 17. Over a period of years beginning before 1900 Knapp engaged in many printing and publishing activities. A number of his publishing ventures, including "The Recorder," a daily newspaper featuring colored lithographic illustrations, the "Associated Sunday Magazine," a weekly newspaper supplement printed by American Lithographic, and "Every Week," also a *240 Sunday newspaper supplement for which petitioner did some printing in 1918, were not long lived or marked by success. 18. During World War I Knapp was also interested in an educational magazine known as the "Mentor," which was printed in petitioner's Springfield plant from 1921 through 1931. It was a magazine of national circulation, and carried some advertising. It was never profitable and was discontinued in about 1931. 19. Gravure printing is a form of intaglio printing and entails the transfer of ink from recesses or depressions in the printing plate or cylinder as distinguished from the use of a letterpress plate or cylinder where the ink is carried on a raised design. In gravure printing the ink is picked up from the recesses rather than from the surface face as in letterpress. This history of printing by the intaglio process goes back to the middle of the 15th Century. Although the use of acid to etch impressions for intaglio printing was known from the early 16th Century and used by great artists, like Van Dyck and Rembrandt (17th Century) and Goya (18th Century) and Whistler (19th Century) it had little practical commercial value until a photomechanical means of preparing *241 intaglio plates and cylinders was developed sometime after the middle of the 19th Century. 20. Primary credit for the development of gravure printing is ordinarily accorded to Karl Kleitsch, a Bohemian, who worked out a practical process in 1875 through the use of a photosensitive gelatin that could be developed and applied to a copper printing plate or cylinder preparatory to etching and thus used to produce depressions of varying depth over a photographic range of tone. The process perfected by Kleitsch came to be known as gravure and as stated in a scholarly study which petitioner released for promotional purposes in 1941 "it is still used with little essential change today." The invention of gravure actually came three years ahead of the invention of letterpress half-tone reproduction. Kleitsch also developed the first rotary press for use in gravure which was in commercial use in England prior to 1900 and introduced in the United States in 1903 by Ernest C. Bradshaw who had worked with Kleitsch for several years and later became an employee of the petitioner. 21. Knapp first became interested in rotogravure printing about 1910 and commenced commercial gravure printing through *242 a newlyformed corporation known as the Corkett-Bruckmann Company in September of 1910. This corporation, which was a direct predecessor of Alco Gravure, Inc., began printing newspaper supplements in gravure within a short time thereafter. It also did some gravure printing for the petitioner as early as March of 1916 when a section printed in gravure was carried in the Woman's Home Companion. 22. Petitioner had a gravure preparatory department and commenced printing monotone sections in gravure for both the Woman's Home Companion and The American Magazine at least as early as 1921, and continued considerable gravure printing for such magazines from year to year thereafter. It had three two-unit web-fed perfecting gravure presses in 1933. A perfecting press is one which prints on both sides of the paper as it passes through. Petitioner had employed at least one highly-skilled gravure technician at least 15 years prior to 1933. The montone gravure equipment on hand in 1933 continued to be used in the petitioner's plant for regular production until 1936 and probably to some extent for several years thereafter. 23. Petitioner's first use of high-speed gravure equipment to do multicolor *243 work grew out of the prior acquisition by Publication Corporation of the patent rights to an enclosed ink fountain for use in rotogravure printing which had been invented by one Adolph Weiss. The basic patent covering this device was issued in 1927 pursuant to an application filed in 1924 and was reissued in 1933. This fountain first came to the attention of Knapp in December of 1931 when, at the invitation of the superintendent of the Alco Gravure plant, both he and Albert E. Winger, who was then president of Publication Corporation and treasurer of petitioner, witnessed the operation of a small demonstration gravure press equipped with a Weiss fountain that did two-color printing at approximately 15,000 revolutions per hour. 24. Knapp and his associates were impressed with the demonstration press which Weiss showed them, and they immediately started negotiations to take over the fountain on behalf of Publication Corporation. A contract which called for Weiss to make a commercial installation of his fountain on a perfecting multicolor (three or more colors) gravure press in the New York plant of Alco Gravure, Inc., was thereupon executed. Working drawings for this installation were *244 started in January of 1932 and the fountain was actually installed in April of that year. 25. The commercial feasibility of the Weiss fountain was demonstrated to the satisfaction of Publication Corporation by about the middle of 1932 and complete ownership of the Weiss patent rights was accordingly transferred to a newly-formed corporation known as Speedry, Inc., which became a wholly-owned subsidiary of Publication Corporation. 26. The central feature of the Weiss fountain was making the reservoir used to supply the highly-volatile gravure inks, which were being developed through research in solvents, binders, and the like, large enough to enclose most of the printing cylinder and thus reduce the rate of their evaporation. It made high-speed gravure, including multicolor, feasible. Before the advent of the Weiss fountain, color gravure was done mainly with sheet-fed slow-speed presses. Some color gravure had also been done on slow-speed web presses. Litigation was initiated in December of 1935, which involved an alleged infringement of various Weiss patents including the basic patent covering the enclosed fountain. The basic patent was held valid and to have been infringed. See *245 Weiss v. R. Hoe & Co., (C.A. 2) 109 Fed. (2d) 722, certiorari denied 310 U.S. 639. It made a substantial contribution to the art, and was an important factor in the industry. Other significant developments in the rapid growth of the gravure process were, e.g., improvements in photographic color separation and reproduction, the manufacture of more satisfactory gravure printing papers and inks, and the subsequent availability of such special innovations as flying pasters, high-speed folders, and automatic register control devices. 27. Alco Gravure was doing a substantial volume of commercial printing on at least one multicolor gravure press equipped with the Weiss fountains controlled by Speedry, Inc., before the end of 1932. Presses of this type were used to print a syndicated Sunday newspaper supplement called "This Week Magazine" which was launched at about that time and was published by another company controlled by Publication Corporation known as United Newspapers Magazine Corporation. Alco had plants in both New York and Chicago, and there was at least one multicolor gravure press in regular commercial use in each of these plants by the beginning *246 of 1934. By 1937, Alco was printing newspaper supplements for about half the papers, using them in this country, and its sole business was gravure printing. The standard of quality has never been as high for newspaper as for magazine printing. 28. Under date of August 24, 1934, petitioner entered into a license contract with Speedry, Inc., calling for the payment of a flat fee royalty of $42,000 on the 12 Weiss fountains, or printing units, to be used in the first two of its high-speed gravure presses. Alco Gravure was also a party to this contract to the extent of giving its consent to the license to the petitioner and waiving its prior rights pursuant to an earlier contract dated November 7, 1932, to an exclusive license for the use of such fountains. Speedry had also negotiated an intervening license agreement of similar character with the New York Daily News at a slightly lower rate. Petitioner's contract with Speedry also gave it the right to use additional gravure units equipped with Weiss fountains in the future upon the payment of an additional flat royalty of $5,000 per unit. 29. The petitioner's first orders for two high-speed gravure presses came in July of 1934. Both *247 of these were installed in 1935. One of these presses was designed for use in printing pages of the size then being used in both Collier's and Woman's Home Companion while the other was designed to print the smaller pages then being used for both The American Magazine and Country Home. Both were capable of printing four colors on one side of the paper web and two colors on the other side. If Knapp's personal inclinations had been followed, more presses of each size would have been included in these first orders, and he began almost immediate agitation for the petitioner to order additional presses on the ground that a stand-by press in each size was essential for continuous gravure printing. Two more such gravure presses were ordered in December of 1934, being one press for each of the two different page sizes, but the American size press ordered at that time was designed to do montone printing only. 30. The petitioner's first commercial use of multicolor gravure printing came more than two years after that of Alco Gravure. The first multicolor gravure printing done in the petitioner's own plant on a high-speed press equipped with Weiss fountains was inserted in the February 1936 *248 issue of Woman's Home Companion. Additional pages of such gravure printing were inserted in each of petitioner's other magazines later in the year 1936 and such printing continued to be used in each magazine from year to year thereafter except that no gravure papes were used in the 1938 issues of Woman's Home Companion. 31. At the time petitioner ordered its first two gravure presses equipped with Weiss fountains, the manager of its printing plant in Springfield, Ohio, entertained serious doubt about the wisdom of its decision to do so, and the same thing was true of several of its executive officers. This reluctance to acquire new equipment for gravure printing was due in part to an awareness of the fact that a much greater degree of personal skill and artistic judgment was required for successful gravure printing. This problem was complicated by the fact that the petitioner's Springfield plant at that time was largely nonunionized and was able to employ labor in most of its departments at wage scales that were substantially below the wage scales then prevailing in printing establishments located in metropolitan areas like Philadelphia, Chicago, and New York, where most of the printing *249 plants were operated as union shops. There were very few craftsmen having any substantial amount of practical experience in gravure preparatory work available anywhere at that time who were not already members of the International Photoengravers Union of North America. There was concern by petitioner's management that the employment of such individuals would lead to the unionization of the great bulk of petitioner's plant employees. 32. Petitioner's management initially attempted to expand its volume of gravure printing and to introduce multicolor gravure printing in its plant without employing any individuals who were already members of the Engravers Union. The personnel which were employed at the beginning included a great many people whose prior experience was limited to kindred trades. Some of these employees were hired from distant places, and it became necessary for petitioner to conduct an extensive training program before it could do multicolor gravure printing in substantial volume. 33. Knapp was impatient with respect to the limited extent to which petitioner made use of high-speed gravure printing in the early part of the base period. He repeatedly took the position *250 with the petitioner's other top executives that the quality of gravure printing was as good as the quality of its letterpress printing at times when the other executives did not share such a view. He was particularly insistent that the petitioner make use of more multicolor gravure printing in its magazines. Petitioner for some years was aware of the general trend to more color in magazines prior to its entry into high-speed gravure. Although Knapp may have been aware of the fact that multicolor printing was more expensive than one-and two-color printing in either letterpress or gravure, he did not appear to be concerned about this feature. They could not get too much color for Knapp, and someone else would have to answer for the costs of the color that he wanted. 34. The monotone high-speed press ordered in December of 1934 was not used nearly as much as the other three multicolor gravure presses in operation in the petitioner's plant during the years 1936 and 1937. Additional units were ordered for this monotone gravure press in December of 1937 and its conversion to a multicolor press was completed about April 1, 1939. The petitioner had no high-speed monotone gravure equipment *251 in its plant at any time thereafter. 35. After both petitioner and Alco Gravure began to have a substantial volume of mutlicolor printing on gravure presses equipped with Weiss fountains, Speedry, Inc., entered into an arrangement for the license of this device to an English firm known as Odham's Press for a total consideration that was reported to be approximately one-half million dollars. 36. Early in 1937, union agitation in the petitioner's Springfield plant culminated in some work stoppages and the execution of union contracts calling for the payment of higher wages thereafter to employees of several important departments. The payment of premium wages to gravure craftsmen contributed to this development. About this same time a broad change in the petitioner's top management began to take place which started with the replacement of its president, the appointment of a new executive vice-president, and the selection of a new plant manager. It also included the designation of a new secretary and a new advertising director. Personal reasons contributed to the replacement of the president. 37. Peter Dennerlein, who took over the duties of plant manager for the petitioner about *252 July of 1937, was made a member of both its board of directors and executive committee within a short time thereafter. He later became a vice-president of the petitioner. Dennerlein characterized the quality of the petitioner's gravure printing in mid-1937 as "lousy" and "terrible." Since he ascribed a major part of such poor quality to a lack of sufficiently skilled gravure technicians, he instituted a major expansion of petitioner's gravure training program by obtaining trained men from the outside, including several former employees of Alco Gravure for that purpose. He actively encouraged the unionization of petitioner's gravure preparatory department in this same connection. 38. A "Press and Press Equipment Displacement Schedule" for the replacement of petitioner's letterpress equipment bore a notation to the effect that it was based on a "new" obsolescence report dated November 14, 1937. The schedule listed the four highspeed gravure presses referred to above, and nine new "Steam-dry" typographic presses, which were being installed about that time. The schedule also called for the eventual acquisition of 17 additional highspeed gravure presses. The first two of such additional *253 high-speed gravure presses listed were set opposite seven typographic presses, all of which delivered flat unfolded sheets, and opposite the notation "7/1/39" to indicate the approximate date for the displacement of these seven presses. No approximate date of displacement was shown on the schedule in connection with the other 15 additional high-speed gravure presses listed on the schedule. All of the projected gravure equipment listed was multicolor equipment designed to print up to four colors on one side of the printing web and up to two colors on the reverse side, except in the case of the two gravure presses carrying a projected displacement date of July 1, 1939, which were described in a footnote as "4 and 4" equipment (capable of printing up to four colors on both sides of the printing web). 39. Two high-speed gravure presses which were assigned the same accounting numbers as the projected equipment shown on the Press and Press Equipment Displacement Schedule of November 14, 1937, were ordered under the date of April 8, 1938. The petitioner was not contractually committed to the acquisition of any further high-speed gravure equipment as of the end of its base period and did *254 not order any additional gravure presses until October 1940, when it placed an order for two gravure presses of a different type than those shown on its above-mentioned replacement schedule. Delivery of these presses was delayed because of material shortages. 40. The first six gravure presses acquired by petitioner had a rated speed of 15,000 impressions an hour, and the next two such presses had a rated speed of 20,000 impressions an hour. This exceeded the rated speed of petitioner's existing multicolor letterpress presses by almost 3 to 1, and the rated speed of multicolor letterpress equipment available during the base period. Normal capacity of a press is expressed in terms of the number of usable impressions it can produce in the course of a normal work week. The normal capacity of the first six gravure presses was 800,000 impressions per week, and the normal capacity of the next two such presses was 1,250,000 impressions per week. The relation between such normal capacity and the actual production of gravure impressions discloses that in 1936 petitioner utilized 25.51 per cent of its normal gravure printing capacity; during the first half of 1939 it utilized 84.01 per cent; *255 during the month of July 1939 it utilized 90.12 per cent; in the fourth quarter it utilized 77.29 per cent; in 1940 it utilized 89.36 per cent; in 1941 it utilized 95.72 per cent, and in December of that year it utilized 94.61 per cent. The complete analysis of the utilization of gravure capacity appears in Exhibit 88, and is incorporated in these findings by this reference. Practical operating capacity of petitioner's multicolor gravure presses was limited by such factors as scheduling of work. 41. There is a fundamental difference between letterpress and gravure printing, both as to the process and the equipment. A printing plant which changes from primarily a letterpress plant to substantial use of gravure printing undergoes a substantial basic and fundamental change. 42. The petitioner effected a gradual increase in the amount of gravure printing carried in The American Magazine and in Collier's from year to year during the base period. Woman's Home Companion carried relatively more gravure printing than in either Collier's or American during the year 1936, but it reduced the number of such gravure pages in 1937, in number and in ratio to Collier's and American, and, after *256 dropping all gravure printing in 1938, carried only eight more pages of gravure printing in 1939 (152 pages for 12 issues) than it had carried in 1936 (144 pages in 12 issues). Petitioner made most extensive use of gravure printing in its Country Home magazines where, excluding cover pages for the years indicated, it carried gravure and letterpress pages as follows: Gravure
Letterpress
1936
112
706
1937
336
516
1938
548
96 Throughout 1939 it printed the complete Country Home magazine, except for the covers, in gravure. 43. Petitioner printed the following number of Collier's size letterpress pages, [1] exclusive of covers and exclusive of pages in Country Home magazine, in the base period: Year
1- and 2-color
3- and 4-color
Total
1936
15,455,143,172
2,105,093,602
17,560,236,774
1937
15,199,515,786
2,593,741,060
17,793,256,846
1938
13,261,063,793
2,432,718,288
15,693,782,081
1939
12,428,694,428
2,225,373,977
14,654,068,405
44. Petitioner printed the following number of Collier's size gravure pages, [2] exclusive of Country Home, in the base period: *257 Year
1- and 2-color
3- and 4-color
Total
1936
513,254,484
299,563,976
812,818,460
1937
1,326,069,968
705,642,604
2,031,712,572
1938
1,453,287,890
633,715,758
2,087,003,648
1939
2,748,875,565
1,164,364,037
3,913,239,602
45. The petitioner carried no gravure advertising in either Woman's Home Companion or The American Magazine during the year 1936 and only one page of gravure advertising in Collier's during that year. This single page carried only one color. It commenced the insertion of two-color gravure advertising in Collier's in 1937 and continued to make a gradual increase in the volume of both one- and two-color advertising carried in this magazine up through the year 1939, when it carried 54.75 pages of one-color gravure advertising and 97.75 pages of two-color gravure advertising therein. It also printed one page of four-color gravure advertising in the December 23, 1939 issue of Collier's. This was the first four-color gravure advertising to appear in any national "slick-paper" magazine. It was a faithful reproduction of the original art work. Petitioner printed no advertising matter of any kind by the gravure *258 process for insertion in the Woman's Home Companion at any time during its base period. It did not commence the insertion of gravure advertising in The American Magazine until 1939, when it carried only 16.18 pages of one-color gravure advertising and 23.52 pages of two-color gravure adveristing in such magazine. Petitioner's total gross revenue from the gravure advertising carried in its three major magazines during the year 1939 was $1,343,686.14, or a little less than 6 per cent of its total gross revenue of $22,098,526.50 from the letterpress advertising carried in the same three magazines during that year. Its gravure advertising linage represented a little less than 7 per cent of its letterpress advertising linage for such magazines in that year. 46. Petitioner's policy with respect to four-color gravure was to gain experience in the process and to obtain reader acceptance of this process before attempting to reproduce advertising in four-color gravure in its principal magazines. It would never have adopted the gravure process if it had not intended to sell gravure advertising. A general announcement regarding the availability of four-color gravure was made in January 1940. *259 47. When Knapp first acquired an interest in Collier's magazine in July of 1919, it already had a substantial circulation, but its adverising revenue fell off about 80 per cent during the first few years of petitioner's management and the new owners in the 10 years after they acquired it spent about $15,000,000 in an effort to put Collier's on its feet. 48. By the time petitioner was able to publish Collier's at a profit it had begun to have serious trouble with The American Magazine which had enjoyed a peak of success about 1923. Petitioner's most successful magazine during the 1920's was Woman's Home Companion, but it began to experience a sharp decline in earnings about 1936. Petitioner's Country Home magazine had long operated in the red. Its unadjusted operating losses had been continuous from 1923 to 1939, inclusive. The loss averaged about $287,000 per annum for the years 1923 to 1935, inclusive. Petitioner's profits on the operation of its bound-book business averaged a little under $500,000 per annum during the base period years. There was no important change affecting the profits of this phase of the petitioner's business in earlier years. 49. A tabular schedule showing *260 the net taxable income of the petitioner and P. F. Collier & Son Company (exclusive of subsidiaries in both cases) as finally adjusted for Federal income tax purposes, appears in Exhibit GGGGG, herein incorporated by this reference. It covers the 18-year period 1922 to 1939, inclusive, and discloses that in only three years (1929, 1930, and 1931) during that period the combined net taxable income of these two corporations was higher than it was in 1936 and 1937. 50. The net income figures for all the business enterprises which the Crowell-Collier Publishing Company was conducting during the taxable years before us are as follows: Net Income (or Loss) as Per Federal
Income Tax Returns of
The Crowell
P. F. Collier &
Publishing Com-
Crowell-Collier
Son Company
pany and Affili-
Publishing
and Affiliated
Year
ated Companies
Company [1]
Companies [2]
1922
$1,836,522.38
1923
1,637,715.23
1924
$1,773,823.15
($1,789,119.09)
1925
1,412,500.97 [3]
( 1,580,486.42) [4]
1926
956,023.20
1927
(212,762.04)
1928
386,166.20
1929
2,251,612.66
1930
2,583,627.95
1931
2,876,785.58
1932
1,837,996.92
1933
1,559,896.71
1934
1,271,911.85
1935
2,539,453.02
1936
3,465,920.57
1937
3,348,388.68
1938
1,479,090.21
1939
2,006,631.08
*261 Net Income (or Loss) as Per Federal
Income Tax Returns of
Total
P. F. Collier
Net Income
Year
& Son Company
(or Loss)
1922
$1,836,522.38
1923
1,637,715.23
1924
(15,295.94)
1925
(167,985.45)
1926
956,023.20
1927
(212,762.04)
1928
386,166.20
1929
2,251,612.66
1930
2,583,627.95
1931
2,876,785.58
1932
1,837,996.92
1933
1,559,896.71
1934
$10,426.39 [5]
1,282,338.24
1935
2,539,453.02
1936
3,465,920.57
1937
3,348,388.68
1938
1,479,090.21
1939
2,006,631.08
51. The net profits or losses of P. F. Collier & *262 Son Distributing Corporation (exclusive of subsidiaries) were never reported separately for tax return purposes at any time during the years 1922 to 1933, inclusive. It usually operated at a loss during this period. Supporting schedules associated with the consolidated returns filed for the years 1927, 1928, 1931, 1932, and 1933, disclose that its parent, P. F. Collier & Son Company, was making substantial charges against it which are identified in the tax returns as "Cost of Manufacturing & Producing Books & Magazines sold by Distributing Corp." These charges were substantially in excess of the separate net income of P. F. Collier & Son Company as shown by its books for each of such years. For example, the 1931 combined net taxable income of P. F. Collier & Son Company and The Crowell Publishing Company as set forth on their regular books of account was $4,946,859.78, whereas the total consolidated net taxable income reported on the Federal income tax return which The Crowell Publishing Company filed on behalf of itself and five other affiliated companies, including P. F. Collier & Son Company, was $2,070,074.20 less than that amount, or only $2,876,785.88. The separate net income *263 of P. F. Collier & Son Company per books was $2,343,476.46, and the intercompany charge made against P. F. Collier & Son Distributing Corporation was $3,199,187.94. This same charge operated to reduce the total cost of goods sold for P. F. Collier & Son Company to $3,201,423.21. 52. The aggregate net income of all corporations as shown in Series C of I.T. Mimeograph 5807, was higher for every year from 1922 to 1929, inclusive, than in either of the years 1936 or 1937. 53. The net profit or loss of all corporations as shown in Series C of I.T. Mimeograph 5807, and the corresponding net income of the petitioner's business as set forth in the last column of the schedule set forth in paragraph 50, supra, and the percentage relationship between such averages in each case for the periods indicated are as follows: Net Profit of
Petitioner's
all Corporations
Net Income
Averages
(in millions)
(in thousands)
1936-1939
$6,662
$2,575
1922-1939
$7,135
$1,647
Ratio of base period
to long term
93.37%
156.34%
54. Petitioner's excess profits net income, as finally determined by the respondent, for each of the base period years 1936 to 1939, inclusive, is *264 as follows: Before any adjust-
ments under Sec-
After all adjustments allowed or allowable
tion 711 for 1943,
under Section 711
Year
1944 and 1945
For 1943
For 1944
For 1945
1936
$3,481,602.49
$3,481,602.49
$3,482,271.63
$3,482,271.63
1937
3,414,004.90
3,553,112.65
3,547,283.59
3,561,743.47
1938
1,853,404.05
2,002,676.64
1,980,604.86
1,988,699.81
1939
2,100,344.14
2,209,959.25
2,206,522.30
2,206,522.30
Average
2,712,338.90
2,811,837.76
2,804,170.60
2,809,809.30
Petitioner's excess profits net income, as finally determined by the respondent, for each of the years 1940 to 1945, inclusive, is as follows: Excess Profits
Year
Net Income
1940
$ 2,035,780.50
1941
2,138,985.98
1942
3,186,114.85
1943
9,266,332.99
1944
11,497,933.48
1945
12,315,762.41
Petitioner deferred payment of the following amounts from its excess profits tax liability under the provisions of section 710(a)(5): Year
Amount
1943
$1,234,689.38
1944
392,931.32
1945
357,005.41
Indices of the profit experience of petitioner and of General Business (Series C) are as follows: General
Year
Petitioner
Business
1936
172.7
102.0
1937
166.9
101.4
1938
73.7
61.3
1939
100.
100.
Average
128.3
91.2
*265 55. The petitioner has regularly recorded its expenses on its books of account under 14 major classifications and has maintained accounts under each of these 14 different categories in separate sections of its profit and loss ledger which were assigned to each of its magazines and to its book department, respectively. Certain charges were divided among the various sections of the profit and loss ledger when originally recorded therein, but other charges were initially recorded in the profit and loss ledger in still another set of general departmental account sheets which were maintained in the Woman's Home Companion section of the ledger. The charges made to these general accounts were then reallocated at the end of each month to the separate accounts maintained in the other sections of the ledger for each magazine and for books. The amounts so allocated to the individual magazines and books for the purpose of these transfers were determined in accordance with allocation formulas fixed on a semi-annual basis for six months in advance in accordance with budgets approved by the petitioner's board of directors. General expenses within 10 of the 14 major departmental account items were *266 so distributed among the individual magazines on the basis of a uniform percentage that appears to have been determined by the relationship which income, or budgeted income, for each magazine bore to the total for all mazagines by 6-month periods. General expenditures for advertising, business extension, and advertising research were allocated on another uniform percentage basis that appears to have been determined by the relationship that advertising revenue, or budgeted advertising revenue, for each magazine bore to the total for all magazines by 6-month periods. The allocation of all general expenditures for editorial publicity, when not charged directly, appears to have been determined on a fixed percentage basis that was arbitrarily determined. Certain general tax deduction items, including bonuses, unemployment insurance, and depreciation were posted directly to petitioner's surplus account and not allocated among its individual magazines at all. Petitioner's departmental accounting system did not follow Federal income tax return classifications. 56. The discontinuance of Country Home resulted in a change in the product furnished by petitioner within the meaning of Internal Revenue Code section 722 *267 . Petitioner's original claims with respect to the discontinuance of Country Home asked that its unadjusted book losses be added back to its excess profits tax net income for each of the four base period years. The Country Home losses sought to be "eliminated" at the time of the trial, which purported to eliminate certain "continuing expenses," were $134,571.04 for 1936, $332,974.11 for 1937, $712,913.80 for 1938, and $653,631.67 for 1939. 57. The amount of book losses to be allocated to the Country Home operations is reasonably reflected in a reallocation of all the charges and expenditures which had originally been allocated to the Country Home magazine under petitioner's manner of keeping its books, in such a way as to put all expenditures and charges into the same categories which petitioner had used in the preparation of its Federal income tax returns. Such a reallocation, together with subsequent tax adjustments, results in income (loss) for Country Home as reflected in the following summary profit and loss statement: 1936
1937
1938
1939
(in thousands of dollars)
Gross receipts
$2,088
$1,879
$1,776
$1,420
Net cost of operations
$ 613
$ 740
$ 853
$ 749
Plus: Total deductions
1,641
1,503
1,672
1 $356
Total of deductions and net cost of
operations
$2,254
$2,243
$2,525
$2,105
Net income(or loss) for excess profits
tax
($ 165)
($ 364)
($ 749)
($ 685)
*268 58. All charges that had been made against the Country Home magazine, either by way of allocation or otherwise, which continued after it was no longer in existence were charged to other magazines or to books on either a direct or allocated basis. 59. Circulation of other magazines increased following the discontinuance of Country Home: Average Number of Copies of Net Paid
Circulation Per Issue
Woman's
Home
Year
Collier's
Companion
American
1936
2,486,050
2,773,379
2,050,797
1937
2,572,729
2,928,096
2,156,858
1938
2,623,972
3,002,249
2,183,749
1939
2,689,724
3,098,181
2,165,475
1940
2,832,063
3,385,274
2,249,171
1941
2,848,004
3,518,386
2,262,827
1942
2,921,908
3,768,767
2,391,128
1943
2,780,515
3,698,875
2,580,808
60. For the base period years one-third of the direct labor charged to Country Home, all of the factory overhead, and all of the compensation of officers would have been continuing costs notwithstanding the discontinuance of Country Home. 61. Substantial expenses, including these enumerated, and amounting in the aggregate to about 10 per cent of the total deductions and net cost of operations *269 included in the computation of the above losses, would have continued notwithstanding the discontinuance of Country Home, and would serve to diminish the amount of the above loss. 62. In 1936 and 1937, petitioner's circulation program was better equipped to weather depression conditions than that of some of its most important competitors, like the Curtis Publishing Company which published the Saturday Evening Post and the Ladies' Home Journal which were in direct competition with Collier's and the Woman's Home Companion, respectively. Curtis Publishing Company had and still has a policy of refusing to accept any advertising for alcoholic beverages - a policy not followed by petitioner. 63. Early in its operations petitioner set up an extensive field selling organization. By 1936, a large portion of subscription sales was being made on an installment pay-as-you-go basis. In addition to the circulation which petitioner achieved through its subsidiaries, whose activities are described above, it also operated a very extensive circulation department of its own. This department included an Organization Finance Division which subscriptions for cash and conducted field selling campaigns *270 for all of the petitioner's magazines, as well as those of other publishers, through institutions located in cities and towns, and the so-called Woman's Home Companion Reading Clubs which operated along the same lines in more heavily populated areas. Other branches of petitioner's circulation department were its free-lance agents, its Vocational Division, and its Pin Money Clubs. Still another group of full-time employees engaged in direct mail and telephone campaigns which are expensive methods of procuring circulation. The only one of petitioner's circulation agencies which concentrated largely (but not exclusively) on the sale of Country Home subscriptions was the so-called Rural Sales Division which was made up of full-time crews of solicitors that operated in rural areas. On the abandonment of Country Home these employees were dismissed or were given new assignments in other departments. 64. While the petitioner's total gross receipts were about $705,000 higher in 1939 than they were in 1936, its gross profit was about $990,000 lower which means that the expenses entering into the determination of its 1939 gross profit had increased by about $1,695,000. In addition, it had experienced *271 an increase of about $106,000 in depreciation charges and about $322,000 in other operating expenses to make a total increase in all 1939 expenses of about $2,123,000. 65. If the same comparison set forth in the preceding paragraph is made between the years 1936 and 1939 after the elimination of all income and expense items charged to Country Home on petitioner's books, or otherwise allocated to it in accordance with petitioner's reallocations, the petitioner's increase in gross receipts would become about $1,373,000, its decrease in gross profits about $186,000, its resulting increase in the expenses entering into the determination of gross profit about $1,559,000, its increase in depreciation expenses about $106,000, its increase in other operating expenses about $606,000, and its total increase in expenses about $2,271,000. 66. The petitioner's gross receipts in 1939 were about $1,911,000 lower than they were in 1937, and its gross profits were about $1,359,000 lower, which means that it was able to reduce the expenses entering into the determination of its gross profit for tax return purposes by about $552,000. The net reduction in all other operating expenses from 1937 to *272 1939 was about $5,000. The petitioner's net total expense reduction was thus only about $557,000, as against the decrease in gross receipts of about $1,911,000. 67. If the same comparison set forth in the preceding paragraph is made between the years 1937 and 1939, after the elimination of all income and expense items charged to Country Home on petitioner's books or otherwise allocated to it in accordance with petitioner's reallocations, the petitioner's decrease in gross receipts would become about $1,452,000, as against a reduction of only about $562,000 in all costs entering into the determination of gross profit for tax return purposes, and an increase of about $145,000 in all other operating expenses. Petitioner's net total expense reduction would thus become only about $417,000, as against the decrease in gross receipts of about $1,452,000. Petitioner's combined publicity and circularizing expenses, exclusive of its Country Home operations as determined on the same basis, were about $343,000 higher in 1939 than they were in 1937, and represented 3.46 per cent of gross receipts in 1939 as against 2.18 per cent thereof in 1937. Analysis of tax return profit and loss figures for *273 petitioner and for its respective magazines is set forth in Exhibit NNNNN, and is incorporated in these findings by this reference. 68. A factor adversely affecting petitioner's competitive position in the advertising field during the latter part of the base period was the growing popularity of news and picture magazines, like Newsweek, Life, and Look. Life magazine commenced publication in 1936. Look magazine commenced publication in 1937. The advertising revenues of selected national magazines for 1933 to 1943 are set forth in respondent's Exhibit CCCCCC, which is incorporated in these findings by this reference. 69. Another factor adversely affecting petitioner's competitive position in the advertising field during the base period and thereafter was the development of radio. Radio began to take a part of the total national expenditures for advertising for the first time about the year 1927, and had a continued substantial growth through 1942. Radio advertising revenue increased about 40 per cent during the base period while total magazine advertising revenue was about 11 per cent higher in 1939 than it was in 1936. Exhibit 11-K, Part I, Schedule 23, which has been incorporated *274 in these findings as part of the stipulated facts, sets forth the amounts of magazine and radio advertising from 1915 to 1949, inclusive, and the comparative position of each. 70. There was a slight increase in total national magazine advertising revenue from 1936 through 1939. Magazine circulation per issue moved up very substantially over the years 1920 to 1946, inclusive, and showed a steady and consistent increase during the entire base period. Total magazine circulation per 100 persons had also been moving generally upward for many years. It stood at 41.4 in 1920 and at 59.7 in 1935, 65. in 1936, 69.3 in 1937, and 71.2 in 1939. Exhibit 11-K, Part I, Schedule 24, which has been incorporated in these findings as part of the stipulated facts, sets forth circulation of national magazines other than comics, the U.S. population, and the circulation per 100 persons from 1914 through 1948. 71. Radio is a low cost advertising medium. 72. The proper conversion factor to convert the number of pages used in The American Magazine to a smaller number that would reflect the same total trim size used in Women's Home Companion and Collier's throughout the base period and up until January *275 1944 is 66.96714317 per cent. 73. The Country Home magazine carried the same size pages as The American Magazine up until 1938 when the size of its pages was increased to the same size then being used in Collier's and Woman's Home Companion. 74. The following schedule shows: (a) the net total expenses (net cost of operations) which were deducted from total gross receipts to arrive at the gross profit reported on petitioner's Federal income tax returns for each of the calendar years 1936 to 1939; (b) the net cost of paper included in such expenses for each of such years; (c) the total cost of operations, exclusive of paper cost for each year;(d) the total number of Collier's size pages printed during each year in millions of pages, using the correct 66.96714317 per cent conversion factor, and (e) the resulting average total cost of operations, exclusive of paper cost, per million pages printed, as determined on the basis of the foregoing items: 1936
1937
1938
1939
Net cost of operations
$13,012,300
$15,260,541
$14,505,477
$14,707,734
Less: Net paper cost
6,562,326
7,662,042
7,087,640
7,001,615
Cost of operations, excluding
$ 6,449,974
$ 7,598,499
$ 7,417,837
$ 7,706,119
paper
Total pages printed (in
20,136
21,682
19,820
20,532
millions)
Average cost of operations,
$320.32
$350.45
$374.26
$375.32
excluding paper, per million
pages printed
*276 75. Petitioner's tax returns included no gross profit for its book department except that which resulted from its sale of books and waste paper. The elimination of the Country Home figures from the schedule set forth in the preceding paragraph would result in converting such schedule to a study of the cost of operations attributable to its three major magazines. The following schedule shows the same type of information set forth in the preceding paragraph, except for the elimination of all Country Home figures therefrom, on the basis of petitioner's reallocation of Country Home expenditures: 1936
1937
1938
1939
Net cost of operations
$12,398,951
$14,520,569
$13,652,494
$13,958,406
Less: Net paper cost
6,313,691
7,351,765
6,742,847
6,713,144
Cost of operations, excluding
$ 6,085,260
$ 7,168,804
$ 6,909,646
$ 7,245,262
paper
Total pages printed (in
19,202
20,672
18,628
19,447
millions)
Average cost of operations,
$316.91
$346.79
$370.93
$372.56
excluding paper, per million
pages printed
76. The Country Home figures eliminated in connection with the schedule set forth in the preceding schedule disclose the following parallel *277 information: 1936
1937
1938
1939
Net cost of operations
$613,349
$739,971
$852,983
$749,328
Less: Net paper cost
248,635
310,276
344,793
288,471
Cost of operations, excluding paper
s364,714
$429,695
$508,190
$460,857
Total pages printed (in millions)
934
1,010
1,192
1,085
Average cost of operations, excluding
$390.49
$425.44
$426.33
$424.75
paper, per million pages printed
77. According to an independent engineering survey conducted in 1937 by Ford, Bacon & Davis, the unadjusted total number of magazine pages printed in petitioner's Springfield plant had been increasing at an average rate of approximately 5 per cent per year over the 15-year period from 1922 to 1936, inclusive, but had increased at an average rate of approximately 10 per cent per year during the last three years of such period. 78. The petitioner's total volume of magazine printing followed a fairly uniform seasonal pattern with peak capacity required for the spring issues (March, April, and May), a somewhat lower peak for the fall issues (October and November), and distinct valleys for the winter (December and January) and the summer issues (July and August). *278 79. The average circulation per issue of all of petitioner's magazines moved upward in every base period year except for slight decline of American in 1939. The average circulation per issue of petitioner's and other specified national magazines for 1923 through 1945 is set forth in Exhibit EEEEEE, and is incorporated herein by this reference. From 1937 to 1939, there was a reduction in the average total number of pages carried per issue in petitioner's magazines. 80. The reduction in the average total number of pages carried per issue in petitioner's magazines from 1937 through 1939 is related to a corresponding decline in total advertising linage which was common to all four of its magazines (Collier's had a slight increase in 1939 over 1938), and to petitioner's policy with respect to the number of editorial pages to be carried from issue to issue at that time. By editorial pages is meant all pages except those devoted to advertising. This policy normally entailed carrying more pages of editorial matter whenever the number of advertising pages went up but involved recognizing that there were very practical limitations on the extent to which the number of editorial pages could *279 be cut as the advertising content was reduced. The most important competitors for each of petitioner's magazines faced a similar problem. Competitive national magazines as a group had a sharp decline in advertising linage in 1938; the year 1939 showed some recovery but was still substantially below 1936. National magazines in general showed a downward movement of linage from 1936 through 1939. A comparison of advertising pages and editorial pages for petitioner's magazines for 1936 through 1945 is stipulated and appears in joint Exhibit 11-K, at Schedule 9. 81. The percentage of editorial pages to total pages was higher in 1939 than in 1937 for every one of petitioner's magazines, and the percentage of advertising pages was correspondingly lower. The percentage of advertising pages to total pages carried in petitioner's Country Home magazine was 45.64 per cent in 1936, 44.28 per cent in 1937, 32.52 per cent in 1938, and 29.49 per cent in 1939. It carried 420.23 pages of editorial matter in 1939 and 175.77 pages of advertising in all issues combined. On the basis of counting three full pages of advertising for the cover pages of each 1939 issue about 20 per cent of such advertising *280 was printed by the letterpress process. 82. The unit averages of all expenses in cost of operations, except paper as heretofore set forth, for the Country Home magazine were substantially higher in each year than for all of the petitioner's magazines as a whole. Extensive use of color was made in the gravure printing carried in the Country Home magazine. The editorial pages which petitioner printed by the gravure process in all of its magazines consisted of a much greater percentage of color pages than in the case of the editorial pages which it printed by the letterpress process. 83. By at least as early as December of 1937, when petitioner ordered the four additional units necessary to convert its only high-speed monotone gravure press to a multicolor press, a decision to carry substantially more multicolor work on editorial pages than its competitors were carrying in their magazines had become an integral part of its decision to make greater use of the gravure process of printing as such. As a practical matter, it was only necessary to have color presses available to end up with more multicolor editorial matter for it had always been in demand by editors. While most of petitioner's *281 top executives were aware that the greater use of color would increase over-all costs, it was hoped such higher cost would be justified by greater popularity with readers and a resulting increase in advertising revenue. 84. Advertisers are finical and demanding in their insistence that proofs supplied to the publisher or printer be very closely matched and have always been extremely concerned about product identification. Product identification relates to the duplication of precisely the same colors, shades, and tones as appear in the product itself, or on the package in which it is customarily sold on the retail level, in every copy of all the different publications which carry a given advertisement. There was some dissatisfaction with gravure printing on the part of advertisers for several years after the base period. There were also some complaints about letterpress printing. 85. In the case of letterpress printing, the achievement of precise color matching was greatly simplified by general industry agreement as early as 1927 upon the standardization of certain process colors to be used in the various inks required for multicolor printing. The use of the same process colors *282 which the engravers used made it much simpler for the various publishers to attain a perfect match of the separate proofs for each of the component colors that were normally supplied to them by the advertising agency along with the original engravings or duplicates thereof in the case of letterpress printing. There had not yet been any process color standardization in the case of gravure printing as of the time when the present proceeding was heard. 86. The problem of product identification is further complicated in the case of gravure printing by the greater problem of maintaining the accurate register of the four different colored cylinders normally used in multicolor printing. In the case of letterpress, printing, each of the different colored inks is applied to the paper in very close succession while the web travels around one central and common pressure roller. Most of the multicolor letterpress equipment in use during the base period had a single set of grippers to hold the paper in position while it was being printed with all four colors. In the case of gravure printing, each of the different colors of ink is applied to the paper web at a different point as the web travels *283 through the press and these points are separated at distances of from 12 to 18 feet. This separation is required because it is necessary in gravure printing for the ink of one color to be dried or vaporized by the application of heat before the next color is applied and a heating device of some sort was universally interposed between each of the printing couples. 87. Letterpress printing lends itself to the use of the special colors which are sometimes required to match the particular product of an individual advertiser. These special colors have long been applied to a single page at the same time that seven or more other pages were being printed with standard process colors through the use of a device known as a split fountain which simply kept the special color ink separate from the process color ink being applied across the face of the printing cylinder to which the printing plates for individual pages are affixed. Letterpress printing at the time of printing can manually control the amount of ink being used in the process. The amount of ink in the case of gravure is determined solely by the depth of the minute wells etched into the copper platings on the cylinder. The gravure *284 system makes it necessary to have the same kind of ink used on all of the different pages which are printed at the same time. 88. Advertisers and advertising agencies frequently made calls for so-called reprints. These reprints required the reproduction of numerous copies of a single page which could be readily accomplished in letterpress printing by making new electrotype printing plates which could be used on a small job press. In the case of gravure printing on the other hand, the preparation of reprints was a costly operation because the etching for one page was carried on the same printing cylinder as that of a number of other pages. This made it necessary to prepare a completely new etching that would not be precisely the same as the original or to waste a great deal of paper in running off the reprints by the use of the original cylinder. 89. The term "form" refers to the complete dress of a press. Thus if the press is capable of printing 32 pages at one time, as was true in the case of petitioner's first multicolor gravure press that was used in printing the Collier's magazine, the form could theoretically be made up of 16 different pages for each side of the web of paper *285 passing through the press, and thus carry a total of 32 different pages. In actual practice, this press was never used during the base period to print more than 16 different pages at the same time. In such cases an etching for each of the pages being printed at the same time would be duplicated once on all of the cylinders actually printing on each side of the paper web, and the printed web would be split and chopped as it came off the press in such a way as to produce two separate units of 16 pages each sometimes referred to as signatures, which is simply another term for a section of a magazine. The form would in such cases be referred to as having been made up of two 16-page signatures. In such instances there would be two etchings for each of the eight different pages on each side of the web, and such a schedule of printing was also referred to in practice as the printing of eight pages two-up on each side of the web. The 32-page presses were more commonly used to print forms consisting of four 8-page signatures. In such cases four etchings for each of the pages being printed at the same time would appear on each of the cylinders actually printing on each side of the paper web, *286 and the schedule of printing would be referred to as a four-up. The 32 pages delivered by each revolution of such a press were in all cases referred to as an impression. 90. The term "form" is also quite commonly used to convey essentially the same meaning as the term "signature." When four sets of the same 8-page signature are being printed at the same time on a 32-page press, for example, this is frequently described as the scheduling of an 8-page form. It is also common trade parlance to refer to running the signature itself four-up in such a case. 91. There was only one instance during the entire base period when petitioner printed a 16-page signature by the gravure process for insertion in Collier's (issue of November 26, 1938,) and all other gravure signatures carried in this magazine during the base period consisted of eight pages each. There were five instances in which a gravure signature of 16 pages was carried in the Woman's Home Companion during the year 1936. All other gravure signatures carried in this magazine in 1936, 1937, and 1939 consisted of eight pages each. There was a greater variety of signatures of gravure printing for both American and Country Home. American *287 included at least one 8-page signature in all base period issues except five issues in the year 1939, for which two 20-page signatures appear. It had no 20-page signatures until 1939, but one or more 16-page signatures are listed for each of the years 1937, 1938, and 1939. Country Home had one 16-page signature for 12 different issues in 1936, and at least one such signature for all other base period issues with a single exception in the year 1937, which constitutes the only instance where it had three 8-page signatures. In addition to the frequent combination of one or more 8-page signatures with one or more 16-page signatures in various issues after 1936, there was one instance of a 12-page signature being used in conjunction with two 16-page signatures and four instances of a 12-page signature being used in conjunction with both two 16-page signatures and one 8-page signature. No more than 16 gravure pages were ever carried in one issue of the Woman's Home Companion during the base period. This same number of pages also constituted the maximum amount of gravure printing used in any issue of Collier's published prior to 1939. No more than 24 pages of gravure appeared in American *288 until after petitioner began the insertion of some gravure advertising therein for the first time in the year 1939. 92. The petitioner's advertising department in its main New York office had primary responsibility for determining the manner in which each of its individual magazines should be assembled. This determination was customarily made by putting together a so-called "dummy" for each issue which was generally similar in appearance to the projected magazine but consisted of kraft paper and assigned space to all the editorial and advertising matter to be contained therein by pasting in proofs or the like. These dummies were then turned over to the petitioner's layout department (also located in New York) which then proceeded to determine how each page in the given issue was to be scheduled for printing. This determination was effected by the preparation of a printed schedule known as a "Press Layout Form" or "Sheet," which described each page in terms of color, gravure, or letterpress printing and advertising or editorial content. These forms also divided the magazine into the various signatures necessary to enable it to be printed and assembled on the equipment available in *289 petitioner's Springfield plant. The preparation of such dummies and press layout sheets often led to the necessity of successive relocations of advertising matter to preserve preferred positions for the advertisers making the most insertions. The preservation of such positions was, of necessity, given first consideration in determining the final layout to be used. 93. The petitioner used two different methods or systems for binding its magazines. All of such magazines other than Collier's, and with the further exception of Country Home after its pages were increased to Collier's size, were assembled for side-stitch binding which was in common use by most monthly magazines. Under this system, each signature, which could consist of consecutively numbered pages, was folded down to the same size as the finished magazine (disregarding the necessity of trimming) and then bound together with all other signatures except the cover (which was glued on later) by staples inserted at the side in such a way that the magazine as fully assembled would not open completely to the center. In the case of Collier's, and all Country Home issues after January 1938, the various signatures were assembled *290 into the finished magazine by staples running from the center of the magazine through the cover in such a way as to permit each page to open completely out to the center fold. This method of assembling was referred to as saddle stitching and was also used by The Saturday Evening Post, as well as various other weekly magazines. It, of course, required each group of pages which appeared in the first half of the magazine to be printed at the same time as corresponding groups of pages which appeared in the last half of the magazine. For example, pages 1 and 2 of the magazine would necessarily have to appear on the same piece of paper as the last two pages. Saddle stitching thus entailed considerably less flexible limitations on the location of multicolor work than in the case of side stitching. This lack of color flexibility was particularly important in the case of four-color advertisements because the advertisers and agencies seldom, if ever, liked to have such advertisements appear in the back part of the magazine. 94. Most of the four-color advertising matter which petitioner sold for reproduction by the letterpress process during the base period years was printed on a fairly heavy *291 coated paper that was more expensive than any other paper which it used for magazine work. Petitioner's top management in charge of paper procurement felt that the additional expense involved in using such coated paper was justified by the fact that it gave a superior appearance to its letterpress printing, as a presentation, over the result obtainable with cheaper paper primarily because of the luster, sheen, and sharper contrasts obtained with the coated paper. It was not commercially feasible to do any gravure printing on coated paper during the base period years, and the petitioner did no such printing on coated paper until about 1952, when it first began to use such printing on the covers of Collier's magazine. This printing was made possible at that time by the development of a more level coated paper than had theretofore been available and the concurrent development of special inks for use on coated paper. Petitioner does not print any part of its magazines, other than the cover of Collier's, on coated paper by the gravure process even at the present time. Multicolor gravure was satisfactorily printed on a lighter grade paper than used on petitioner's multicolor letterpresses. *292 One- and two-color printing for gravure and letterpress was on the same weight paper. 95. The system used to designate the relative weight of all papers ordinarily used in magazine printing is based upon the combined weight of 500 sheets of the given paper measuring 25 inches by 38 inches each. In regular commercial practice, such a quantity of paper is considered a standard ream and its weight in pounds constitutes the basic weight of the paper. Thus, if such a ream of any particular paper weighs 53 pounds, the paper is commonly referred to as 53-pound paper. Magazine papers are ordinarily bought by the ton and, as a general principle, the price per square foot tends to decrease with a decrease in the basic weight of the paper. 96. Petitioner always used a heavier paper for the covers than for any other part of its magazines, and it charged a premium of from about 20 per cent to about 30 per cent more for the four-color advertising ordinarily carried on the last cover page than for that carried elsewhere. It also charged a premium of 10 per cent more for the four-color letterpress advertising carried on all other cover pages of the Country Home magazine. The heaviest paper used *293 at any time during the base period for work other than cover pages was a 53-pound paper, all of which was employed in printing what were generally referred to as insert pages to distinguish them from the much more numerous "body" pages that were normally printed on lighter weight papers. 97. The paper above referred to also came within another generic class of paper known as free sheet paper to distinguish it from so-called groundwood paper. The latter class of paper includes that ordinarily used for daily newspapers and contains various resins that give it a rather brown or yellow color which becomes increasingly evident with the passage of time. The pulp from which free sheet paper is made goes through an additional process to eliminate such resins and produce a whiter paper of more pleasing appearance. The general appearance of either free sheet or groundwood paper can also be improved by subjecting it to an additional rolling or smoothing operation during the process of its manufacture to produce a more level or even finish. Any papers that have been given this extra rolling treatment are referred to as supercalendered papers. Non-coated free papers that have not undergone the *294 supercalendering operation are known as English-finish or machine-finish papers. All the coated papers petitioner used during the base period carried a surface coating of clay or the like which had been applied at the same time that the paper itself was made but the amount of such coating varied in sufficient degree as to create an intermediate general class of paper with a very light or "wash" coating that was sometimes referred to as "supertone" or "super print," and was not a coated paper in the strict sense. 98. As the majority of the paper used in magazines of general national circulation is free sheet paper, any abbreviated reference to supercalendered paper or even more simply to "super" is commonly understood in the magazine publishing industry to refer to free sheet paper that is also supercalendered paper. The same thing is true of all general references to machine finish, supertone, or coated papers. Each additional process which paper undergoes in the process of manufacture tends to improve the printing result which can be attained with it but also tends to add to its cost. Free sheet paper is substantially more expensive than groundwood, and, as a general rule, moves *295 up to higher price levels from machine finish to super, from super to supertone, and from supertone to coated. Paper purchased in the form of flat sheets also tends to cost substantially more than if bought in rolls. Such general cost relationships obtained throughout the base period and for several years thereafter. 99. The 53-pound papers which petitioner used for insert pages included a relatively large proportion of supercalendered papers and no machine finish papers. Nearly all the body pages carried in its three major magazines consisted of 43-pound machine finish papers throughout the entire base period. Such papers accounted for about half of the total tonnage of all magazine paper that petitioner used during each year of the base period, but it also made limited use of 48-pound super papers for both letterpress body pages in Woman's Home Companion and some editorial insert pages in American. 100. The petitioner made regular use of a 65-pound super paper for the covers of both Collier's and Country Home during the base period years. Although it had been using free sheet papers exclusively for all four of its magazines prior to 1936, it shifted most of the printing in Country *296 Home, except for the covers, to a much cheaper groundwood paper very early in the year 1936, which was about the same time that it began to make extensive use of gravure printing therein. Almost one-fourth of the groundwood paper so used in 1936 had a basic weight of only 40 pounds and the remainder was 43-pound paper. It continued to use a limited amount of free sheet paper for the inside pages of Country Home during 1936, but restricted such use in 1937 to a very small quantity of 53-pound super paper for letterpress insert work. It made the shift to groundwood paper complete in 1938, when it practically ceased to use any letterpress printing for the inside pages of this magazine. During the entire year 1939, when gravure was used exclusively for all Country Home printing, except the covers, the only paper used for such gravure printing was 40-pound groundwood paper. 101. All, or substantially all of petitioner's gravure printing outside of that used in Country Home was done on a 43-pound machine finish paper up until some time during the last few months of 1939, when it first began to use a 43-pound super paper for such printing. The use of such slightly more expensive paper improved *297 the appearance of its gravure printing in sufficient degree as to make the successful use of it an important factor in its decision to commence the sale of four-color advertising for reproduction by the gravure process in its three major magazines. Its first general offer to accept such advertising was announced to the trade in January of 1940. One such advertisement was sold and published in the fall of 1939. By March 1, 1940, its general manufacturing specifications called for all gravure printing to be done on a 43-pound super paper although somewhat cheaper machine finish papers of the same weight were still being used extensively for letterpress printing at that time. 102. In addition to the relatively expensive coated paper which was used primarily for four-color advertising letterpress insert pages during the base period years, petitioner also began to print a great many of such pages on the somewhat less expensive supertone paper after it began to become available in sufficient quantity for that purpose around the latter part of 1937. Definite plans for shifting from 53-pound coated paper to 53-pound supertone paper for all of such work were initiated about the middle of *298 1937 and carried out during most of 1938, but this program was reversed for Woman's Home Companion and for American in 1939, because of a favorable price on coated paper. 103. Petitioner followed the general policy of using magazine paper of a quality that was as good as, or better than, that being used by its most important competitors. It was using groundwood paper for gravure printing in Country Home. Knapp took the position, when pressing for the acquisition of more gravure equipment in March of 1939, that a cheaper groundwood should be used for all gravure printing in Collier's and the other magazines. 104. The failure of magazine publishers to use better paper had been a complaint of advertising agencies to everybody in the business for a period of 25 years. 105. The use of better quality and heavier weight paper for letterpress inserts toned up the petitioner's magazines and offset the use of cheaper paper in the other parts thereof. Under the severe competitive conditions which obtained during the base period years, any shift to lighter weight paper on the part of one magazine publisher normally became the prompt target of criticism on the part of advertising salesmen *299 for other publishers. It would have been unfavorable to petitioner to use any groundwood paper in petitioner's three major magazines during the base period years for competitive reasons, and it would have been unwise to use paper as light as 43 pounds throughout any of them. At the time of petitioner's contemplated expansions of gravure printing, Winger advised Knapp that he was of the opinion that there was no reasonable prospect of reducing the heavy paper costs which had been incurred in 1937, because he thought that it would have been unwise for petitioner to use any cheaper grades of paper than it was then using because of the importance of paper quality in the general competitive picture. 106. It was possible to confine the use of the more expensive 53-pound paper substantially to four-color pages because the letterpress equipment used to print them was sufficiently flexible as to permit the scheduling of signatures consisting of almost any total number desired and of as few as two pages (one sheet printed on both sides) if necessary to avoid the undue use of such paper for work which did not justify the use of such expensive paper. And, the flexibility of this letterpress *300 equipment also made it possible to locate four-color advertisements at any desired position within the magazine and thus comply with the insistence of advertisers that four-color advertising inserts be spaced in such a way that some black and white printing would come between each of them. The achievement of a relatively high percentage of advertising color saturation on the forms used for such insert pages was desirable to profitable operation of any magazine publishing business under the competitive conditions which obtained during the base period years. 107. Master letterpress engravings prepared from the original art work can be reproduced by the Royal type process, although some publishers would not accept them during the base period. The printing plates used in the letterpress process are prepared on an individual page basis throughout and the reproduction of each original engraving to a high degree of mechanical perfection has long been quite commonly achieved in the preparation of any desired number of multiple plates for a given page. Such factors make for uniformity in the appearance of the finished product, not only from one copy of a particular magazine to another, but *301 also from magazine to magazine and from publisher to publisher, all aspects of which are matters of particular concern for advertisers. It is more difficult to achieve a comparable degree of uniformity in gravure printing. 108. Flexibility in the location of material within a magazine is necessarily restricted by the use of press equipment which delivers folded signatures as distinguished from flat sheets. None of the multicolor letterpress equipment which petitioner had in its plant at any time during the base period was equipped with folders. All of the first six high-speed multicolor gravure presses which it acquired prior to the end of the base period were so equipped. Presses with folders attached normally operate substantially faster than comparable presses delivering flat sheets. Petitioner had six letterpress machines capable of doing two-color work which were equipped with folders as of the end of its base period. 109. These six letterpress machines capable of delivering folded signatures printed with two different colors (on each side of the paper web) included three presses that printed 64 American size pages per impression. One of these three presses was acquired in *302 1923, or earlier, and the other two were acquired in 1925. These presses were relatively slow for their type. The plant manager had recommended as early as February of 1936 that they be sold or scrapped in favor of larger and more modern folder type equipment. 110. The other three folding delivery presses referred to above were included in the nine steam-dry presses installed about the latter part of 1937, referred to earlier. The decision to have only three of these steam-dry presses equipped with folders was dictated by the superior flexibility of equipment delivering flat sheets as distinguished from folded signatures. The folders which were installed on three of these steam-dry presses were not capable of operating as fast as the presses themselves and constituted the effective limiting factor so far as the speed of the integrated unit was concerned. Such folders were of a type which could not be commercially operated at as high a top speed as the folders used on the multicolor gravure equipment which petitioner placed in operation during the base period years but in actual practice the steam-dry presses with folders produced about the same average hourly output of net usable *303 impressions as such gravure presses during the base period years. 111. The press displacement schedule referred to earlier included certain typographic presses equipped with folders other than those described above that could be used for two-color printing on one side of the web at the same time that black and white, or one-color printing was being done on the other. Such presses consisted of 11 that printed 48 Collier's size pages per impression and five that printed 64 American size pages per impression. The Collier's size presses in this class had been purchased in 1928, 1929, and 1930, while all of the American size presses had been purchased in 1923, or earlier. Petitioner had a total of about 100 typographic presses capable of doing magazine work on hand at the end of the base period but many of them were old. Although 14 old typographic presses had been written off near the end of 1938, about 40 of the total presses remaining had been writhdrawn from service prior to the beginning of 1939 and at least 30 of such total were more than 20 years old at that time. Petitioner's competitors were using some presses equally old at that time. 112. Prior to 1936, most of the rather *304 limited amount of multicolor printing being done in magazines of general national circulation made use of letterpress inks which were made up largely of pigments carried in oils and varnishes that were dependent upon oxidation and absorption for drying. This type of ink made it necessary to use presses for multicolor work which printed on only one side of the paper at a time in order that the first side printed could have time to dry before the reverse side was printed. New inks were made up of pigments and resins carried in solvents of relatively high boiling point and could be successfully dried or set almost instantaneously by the application of heat which votalized the solvents. Such inks came to be generally known in the printing industry as heat-set or heat-flash inks, but were sold under a variety of trade names, including "flash-dri" and "vaporin." All solvents of this type tend to be easily inflammable and even explosive if not carefully handled. The basic solvents used in heat-set letterpress inks are similar to those used in gravure inks. 113. The development of heat-set ink and an increasing demand for multicolor advertising also led to the introduction of perfecting *305 presses for use in multicolor letterpress work. Although perfecting letterpress equipment had been generally available for both one and two-color work well before the development of heat-set inks, equipment of this type did not begin to become available for general commercial use on four-color work until about 1935 or 1936. About the time petitioner set up its target program for the eventual replacement of a major part of its letterpress equipment with gravure equipment pursuant to its press displacement schedule described earlier, one of its most important competitors, The Curtis Publishing Company, which has long printed and published The Saturday Evening Post and The Ladies' Home Journal, arranged for the purchase of some of such so-called five and five letterpress equipment equipped with folders. This equipment was installed at very substantial expense during the first part of the year 1938. Initially Curtis had trouble with its heat-set inks and drying. High-speed, heat-set ink equipment was commercially usable before the end of the year 1939 for Curtis and for other publishers competing with petitioner. 114. The printing result attainable with presses making use of the new *306 heat-set inks was an improvement over that attained on roll-fed presses using the older type letterpress inks. Many of the latter employed a blotting paper known as "tympan" to assist in drying the ink. Such tympan paper tended to produce a certain amount of smudge and "lick-off" that gave an undesirable appearance to the finished product. Heat-set ink made it possible to eliminate this tympan paper and its undesirable features. 115. The new multicolor letterpress equipment which petitioner's competitors began to use prior to the end of the petitioner's base period was more flexible than the high-speed multicolor gravure equipment petitioner had at that time, due in part to the greater number of different inking rolls available which made it easier to distribute multicolor advertising material within a given form or magazine. 116. The use of certain older types of letterpress printing presses which was necessary to achieve the greatest flexibility in the planning and location of multicolor printing and at the same time maintain the topmost quality of reproduction and appearance was more expensive on a per page basis than the less flexible high-speed equipment that was available *307 in either the letterpress or the gravure field as of the end of the petitioner's base period. As a general rule the attainment of higher speed in either process has always entailed some loss of flexibility as well as some deterioration of quality in terms of uniformity and fidelity of reproduction. As higher speed normally produces some reduction in unit costs, the necessity of fulfilling demands for maximum flexibility and top quality is the only reason why the use of certain letterpress types of multicolor sheet delivery presses still persists today in many publishing areas. 117. These letterpress developments exerted some adverse influence on petitioner's competitive position during the latter part of the base period. Thereupon petitioner began modernization of some of its own letterpress equipment and made plans for the addition of more printing units to its gravure presses so that they could be used to print up to as many as four different colors on either side of the paper web. Most of this work was not carried out until the end of 1939. 118. The new perfecting letterpress equipment making use of heat-set ink and equipped with folders made it feasible to use lighter weight *308 paper for multicolor work because it avoided the rehandling of printing that was delivered in flat sheets for either a second printing operation or a separate folding operation. Gravure press equipment could also use the lighter weight paper. 119. There was the general opinion throughout the magazine industry that paper having a basic weight as low as 43 pounds would not work on the typographic presses of the sheet delivery type or on the folding equipment which petitioner was still using to print and fold all its multicolor insert pages as of the end of its base period. Petitioner made use of even lighter weight paper, however, for its insert printing following the institution of paper rationing about the end of 1942. Other publishers also reduced the weight of their paper. 120. Both letterpress and gravure printing were troubled with the problem of printing showing through from one side of the paper to the other. 121. Within 3 or 4 years after the introduction of Look magazine, its publisher became concerned about the adverse reaction of advertisers and advertising agencies to its exclusive use of both thin paper and the gravure process of reproduction for the printing of it. *309 The publisher also conducted an extended survey of readers on a substantially continuous basis during the years 1941 to 1945, inclusive, which disclosed that the average reader had the impression that other magazines using heavier paper were of better quality than Look. The general reader reaction disclosed by these surveys was that both Look and Collier's used cheaper quality paper and printing than Life which used the letterpress process throughout because Life looked better and felt better to the touch. The personnel in charge of interviewing readers and otherwise measuring their attitudes during the course of these surveys founds that the editorial content of Look was generally well received but picked up a persistent preference for Life even among those people who said they felt Look had more substance in its editorial material. On the basis of recommendations growing out of such reader surveys and the persistence of the unfavorable attitude towards gravure printing on the part of the advertisers, the publisher began to have certain parts of Look printed by the letterpress process for the first time about 1946 or 1947. The letterpress forms introduced at that time were primarily *310 intended for advertising material but also carried some editorial matter as well. All of the gravure printing for Look was done from the beginning by the Alco Gravure Division of Publication Corporation. 122. On or about January 9, 1939, the petitioner and Publication Corporation (acting on behalf of its Alco Gravure Division), as licensees, entered into a written option with News Syndicate Co., Inc., as licensor. This agreement ripened into a royalty and license agreement upon the expiration of a 90-day trial period and covered a process of preparing gravure cylinders for use in multicolor printing that is commonly referred to in the trade as the Dultgen or News-Dultgen process. This process, first used in printing the New York Daily News, was invented and patented by Arthur Dultgen, who also executed the agreement just mentioned. It differs from the socalled conventional gravure process in several material respects. The conventional process employs a very fine crossline screen at the final photographic stage of reproduction for the purpose of breaking up each of the primary colors and black in the original art work or type matter into very small squares of uniform size so that *311 different tones in the printing are achieved solely by differences in the depth of the minute ink-carrying depressions in the cylinder. In the News-Dultgen process two different positives are prepared for each of the primary colors and for black at the initial stage of photographic reproduction, one of which breaks up the picture into opaque half-tone dots by means of an engraver's screen. Use of the combined images of these two positives at the final photographic step in reproduction causes the small dots or depressions on the printing cylinder to vary in both size and depth, thus making more faithful reproduction possible. Petitioner and Publication Corporation agreed to pay an annual royalty of $12,500 each for the right to use such process. 123. Both petitioner and Alco Gravure required assistance and instruction from Arthur Dultgen himself in order to make the Dultgen process work. Petitioner ceased to use the conventional process for all multicolor work after it became a licensee of the Dultgen process and the same thing was true of Alco Gravure at least in so far as its printing for Look magazine was concerned. The Dultgen patents covered a complete process of gravure cylinder *312 preparation and petitioner's switch to this process entailed the abandonment of certain techniques and materials which it had used in following the conventional process. The Dultgen process had been unknown to both petitioner and Alco Gravure until a short time before the license agreement mentioned in the preceding paragraph. As of the end of the base period, petitioner was producing gravure printing of substantially the same quality as that produced by Alco Gravure. 124. Alco Gravure had made at least one other early attempt to make use of a special patented system of gravure cylinder preparation which did not turn out nearly as well as the Dultgen process in actual practice. A man named Wilkinson, who held a number of patents relating to the preparation of gravure cylinders, entered into a contract with Alco Gravure dated March 1, 1935, looking towards the licensing of Alco under such patents. Alco Gravure did not take a license under this process, however, and its refusal to do so led to litigation which terminated in Alco's favor. Some of the petitioner's gravure preparatory department employees were also involved in this litigation. Winger is of the opinion that Alco would *313 have been better off if it had never heard of Wilkinson because it wasted several months in an unsuccessful effort to make his process work. 125. Petitioner engaged in considerable experimentation in connection with gravure techniques and mechanical aids in the application of gravure processes. It applied for no patents thereon. The electric eye which made automatic register adjustments during the operation of a multicolor gravure press was successfully developed by the General Electric Company and made available about March of 1942, although an engineer of Alco Gravure had experimented with an electric eye device for this purpose before the end of 1939. It took about 6 months for petitions to adjust this to satisfactory working order. 126. Petitioner did considerable experimentation with a method of etching gravure cylinders so that the desired intensity of color could be obtained in high speed gravure printing. The cylinder etching was different for this than for the old fashioned gravure printing with an open fountain and slow drying inks. Petitioner's letterpress preparatory department equipment, with the exception of that used for type setting, could not be used in the gravure *314 preparatory operation. 127. In 1934, petitioner purchased a small sheet-fed Walter Scott flat bed press to make proof plates in experimenting with color separation photography and color printing. It also was used in connection with experimental gravure cylinders. The Walter Scott proof press had no commercial use other than for experimentation. Experimentation with color gravure continued during the years following 1934. The production of high-speed gravure printing required cylinders to be produced which would not vary more than 1/1000th of an inch in circumference from cylinder to cylinder. Petitioner had to redesign regulation monotone photoengraver cameras to accomplish its color separation work. 128. Color separation photography is the process of photographing a full color piece of art on a color transparency so that it is possible to make the separate printing plates required to print each color. The first step in the gravure process is the preparation of color separation negatives. At the beginning of the base period color separation work was done with the use of liquid filters, which are glass cells filled with colored liquid to filter out light. The filters are attached *315 to the front of the camera lens. The liquid filter was not stable and petitioner encountered difficulty in holding register. After experimentation, petitioner adapted its cameras so that gelatin filters could be used. This required the design of very thin filter holders which could be inserted in the Waterhous slot of the lens. 129. After separation negatives are obtained, it is necessary to retouch them due to the limitations of photographic materials and filters. To improve the retouching process petitioner developed the use of existing mechanical aids called "pumperinners," "high lighters," "opaquers," "correctors," "subduers," and "blast shots." 130. The next step is photocomposition of the negatives onto a positive. This is done by setting up negatives in a layout for photocomposition. 131. A screened positive is next prepared. Screened positives are prepared on glass. 132. Register control in the preparation of negatives is done by first placing register marks along the edge of the art work itself so that they will photograph with the art work. These register marks are then used so that the mechanical aids can be placed in position and are also used to aid the negative *316 layout man in preparing his job so that photocomposed positives can be made. 133. Photocomposition requires special lighting equipment that was not available at the time. Petitioner designed and developed light tables that would produce an even illumination of the proper color temperatures and foot candle readings. The first light tables developed by petitioner had tungsten bulbs that varied in color temperature and also gave off heat which warped the film or heated the glass, softening the emulsion. Petitioner then designed light tables which were built deep enough and had enough bulbs in them to give the proper foot candles of light, but these tables did not produce the proper color temperature of light. Mercury tubes were next tried but were not practical since they have to burn in certain positions only. Petitioner later redesigned its light tables and reflectors to permit the use of fluorescent tubes. 134. Petitioner redesigned the backs of its cameras so that they would be more stable and facilitate maintaining register. 135. Further designing permitted photographing of continuous tone positives and screened positives, when petitioner began experimenting with the Dulgen *317 process. 136. A Dultgen screened positive is a positive photographed through a half tone screen onto sentitized material. This screen breaks up a continuous tone into variable sized dots from highlight to shadow. A compensating arrangement had to be designed to allow for the refraction of light passing through the thickness of the glass screen. Further retouching of the positive is required to correct tone values that were deliberately left uncorrected in the negatives. Dultgen positives were originally made on film, which proved unsatisfactory and glass was subsequently substituted. 137. Previous to 1934, all text matter was set in the composing room in type, and proofs were pulled from forms on a very fine proofing paper so that they could be photographed on a wet place. Positives were made from the negatives. The text positives were then assembled and placed in proper position on the art positive. Petitioner devised a method involving the use of a plastic material to pull proofs that would eliminate all photographic work of text matter. 138. Petitioner experimented with cellophane and translene for this purpose and adopted the use of translene. Petitioner designed a reduction *318 gear on a directoplate offset press so that suitable proofs could be made on transparent material. The use of translene was an entirely new process developed by petitioner and was not used by any other printing company during the base period. Translucent proofs prepared by other printers on onionskin paper or wax paper lacked sharpness and opacity and could not be used as a photographic negative. The use of translene proofs eliminates photographing of printers' proofs pulled on white paper, retouching, and making additional proofs from negatives. 139. Carbon tissue is not stable and required petitioner to install air conditioning to control the temperature and humidity of rooms in which it processed carbon tissue. Carbon tissue is a pigmented gelatin on a paper backing onto which the image of the positive is printed. Carbon tissue is sensitized in a solution of bichromate and is then dried under conditions of controlled temperature and humidity. Special drying drums were designed to dry the carbon tissue evenly. Once the carbon tissue has been sensitized it is printed to the screened positive and the continuous tone positive in a vacuum printing frame exposed to a printing light. *319 Register is kept during the process by means of three needle holes punched through the carbon tissue taken from the register marks on the plate. After exposure the carbon tissue is laid onto the copper printing cylinder into position with scribe marks to maintain register. 140. A special machine for placing scribe marks on cylinders was built for petitioner by John Motter Printing Company to petitioner's specifications. The cylinder is then rotated in a pan of hot water until the paper backing becomes loose and is removed, leaving the gelatin remaining on the copper cylinder. Portions of the cylinder which are not to be etched are coated with an acid resisting paint. The cylinders are etched by revolving them in solutions of varying strengths of perchloride of iron. 141. The etching operation is dependent to a great extent on the skill and experience of the operator, who must determine the strength of the acid solutions and the length of time in which the cylinder is permitted to remain in each etching solution. After the cylinder is taken out of the etching solution the remaining gelatin, along with the protective paint, is removed leaving a clean copper cylinder. The etched *320 cylinder is proofed in a proofing press so that the quality of the etching can be determined. If the proof indicates that corrections are necessary to the cylinder, they are done by re-etching to make the wells deeper or by burnishing which makes the wells smaller. After a cylinder has been used for printing the copper shell is stripped from the cylinder base and a new copper shell is electrolytically deposited. The recoated cylinders are then placed in a grinding machine and made perfectly smooth by the use of grinding stones. They are ready to be used again. 142. The use of a screen which was inherent in gravure reproduction made for a certain fuzziness in type matter at least during the base period years and for some time thereafter while letterpress printing produced sharper type matter. This fuzziness was usually discernable only with a glass, and some people indicated a preference for this softer type. The standard of register which petitioner was able to achieve with gravure printing continued to be inferior to its letterpress printing until some time during the year 1942. Some advertisers and some agency men were "sour" on gravure and refused to use it at all for many years. *321 There was no instance where there was any corresponding refusal to make use of letterpress printing. Many of petitioner's own top officials continued to be very critical of gravure printing even after petitioner began the general sale of all kinds of gravure advertising. 143. At the end of 1939, the gravure method of printing as developed and used by petitioner was capable of an acceptable technical standard of quality as evidenced by example of such work submitted at the hearing. Some people in the business none the less preferred letterpress. 144. Considerable time of the key men in petitioner's gravure preparatory department immediately prior to and during the base period was taken up by development and experimentation. The time spent in training new employees is not time spent in research and experimentation. 145. Petitioner, between 1934 and 1945, incurred some labor costs in the development of the multicolor gravure printing process. 146. At Knapp's urging, petitioner's top management had given consideration to ordering additional high-speed multicolor gravure presses in the spring of 1939, and again in the late fall of that year, but had tabled the matter for later *322 consideration on both occasions although Dennerlein then believed that it would take at least 15 months to get such a press into actual operation after it was ordered. One report recommending such a deferment was made to the petitioner's top executives under date of May 22, 1939, when no decision had yet been made to discontinue publication of the Country Home magazine. This recommendation placed primary emphasis on the fact that petitioner would not be in a position to utilize the resulting increase in gravure printing capacity to any advantage without the inclusion of more advertising in the projected gravure signature capacity than it yet had assurance of selling. It also referred to the difficulty which petitioner was experiencing in locating more competent gravure technicians. A similar report made under date of November 20, 1939, referred to the discontinuance of County Home and the resulting transfer of the gravure press capacity formerly utilized for it to petitioner's other magazines as the primary reason for recommending that any decision for the purchase of more gravure presses should again be put over until April of 1940. This second report also referred to the adverse *323 effect which the ordering of additional gravure equipment might have on certain pending union contract negotiations with letterpress employees. The ordering of additional gravure equipment was again deferred to the fall of 1940. 147. The percentages of gravure pages printed to total pages printed for the petitioner's three major magazines for the years 1936 through 1942 are reflected in the following schedule: Percentage of Gravure Pages Printed to
Total Pages Printed
Woman's
All
Home
The
Three
Com-
American
Maga-
Year
Collier's
panion
Magazine
zines
1936
2
9
4.5
4.2
1937
11
6
11.5
9.8
1938
15.5
0
14
11.2
1939
23
11
23
20.1
1940
34.5
24
45
33.7
1941
36.5
27
49.5
36.2
1942
54.5
37
50.5
49.2
148. A comparison of the annual advertising revenue of petitioner's three major magazines with the total advertising revenue of all the principal competing magazines in each of their respective fields discloses the following: Share of Total Advertising Revenue in Field Woman's
The
Home
American
Year
Collier's [1]
Companion [2]
Magazine [3]
1936
30%
24%
42%
1937
30
26
41
1938
29
26
41
1939
26
24
40
1940
23
22
39
1941
21
22
35
1942
21
21
34
*324 The statistical information set forth in the two paragraphs next above was recorded on a series of charts which were received in evidence as Exhibits TTTTTT and UUUUUU, and are herein incorporated by this reference. 149. Advertising revenue is the most important determinant of any publisher's earning capacity and any factor which tends to cheapen a magazine from the standpoint of the readers will tend to reduce its prospects for advertising revenue, as well as circulation revenue. 150. The amount of advertising revenue per copy which a publisher is able to obtain for each magazine distributed shows the degree to which that magazine enjoys the acceptance of advertisers and advertising agencies. Since advertising revenue ordinarily constitutes a major share of the total income of a publisher, a magazine which does not succeed in obtaining as much advertising revenue per copy as its competitors *325 is in an inferior position to compete with other magazines. The total circulation of a magazine, the volume of advertising carried in each issue, and the advertising rate charged per page are all factors in the concept of advertising revenue per copy. The amount of advertising revenue per copy obtained by one magazine in relation to the other magazines in its field represents the net verdict of evaluation of advertisers as to its comparative value or popularity as an advertising medium. Average advertising revenue per copy (in cents) of each of petitioner's three major magazines and their principal competitors for the years indicated is as follows: Woman's
Saturday
Home
Evening
Com-
Year
Collier's
Life
Look
Post
panion
McCall's
1936
9
6
17
21
21
1937
10
7
2
17
21
18
1938
8
6
3
14
18
15
1939
9
9
2
15
16
15
1940
9
12
3
16
14
16
1941
10
14
3
16
13
15
1942
9
14
5
14
13
14
1943
12
17
11
16
16
17
1944
13
18
11
18
18
20
1945
13
20
12
19
18
22
1946
15
22
11
24
20
24
Ladies'
Good
The
Home
House-
American
Cosmo-
Year
Journal
keeping
Magazine
politan
Redbook
1936
23
34
12
16
9
1937
21
35
13
17
10
1938
17
28
11
13
9
1939
16
28
12
14
11
1940
16
27
11
15
10
1941
17
22
8
13
8
1942
18
20
7
12
7
1943
22
25
13
17
9
1944
24
29
16
20
12
1945
26
33
17
22
14
1946
36
35
20
24
12
*326 151. A series of three charts covering the years 1936 to 1946, inclusive, was received in evidence as Exhibit VVVVVV, and is herein incorporated by this reference. The charts show the comparative annual movement of advertising revenue for each of petitioner's three major magazines in relation to (a) the total advertising revenue of its own magazine field; (b) the total advertising revenue of all magazines, which revenues were tabulated by the Publisher's Information Bureau [3] for such years; and (c) the total advertising revenue of network and spot radio, as reported by Publisher's Information Bureau. These charts record the annual changes in revenue over this period in terms of the percentage relationship which each component charted bears to its level for the year 1937. 152. A memorandum from Beck, addressed to the petitioner's finance committee and dated October 9, 1939, reads, in part, as follows: "October 9, 1939 "TO THE FINANCE *327 COMMITTEE: "Our actual and estimated figures for the second six months of 1939 show that we will make practically no profit, in spite of a Book Department sales revenue of $2,950,542., a circulation net revenue of $1,946,015 available for manufacturing, and an advertising volume of $8,645,053., which is $512,536. under the budget. "This is an intolerable situation due to our inability to sell sufficient advertising to justify the expense we are under that has been built up through years when costs and taxes were much lower. "Our organization and expenses are geared to a volume of business not presently procurable, in spite of the improvement in general business. "The major items of increased expense, as compared with good years, are taxes, including social security, wages, promotional costs, and the maintenance of vastly greater circulations. "Lack of greater advertising revenues is attributable in the main to: "1. Continuing increases in radio advertising, which have seriously impaired the whole women's magazine field. "Note. Procter & Gamble formerly carried as much as 56 pages in the Woman's Home Companion in one year, now run 12 pages and invest about $6,000,000. *328 in radio. The story of General Foods, Standard Brands, Lever Brothers, and others, is similar. "2. Increased competition, notably LIFE. "Under the circumstances, I am convinced that it is imperative for us to cut controllable expenses drastically, with the least possible injury to our major properties, and to greatly lessen our promotional activities, even though this puts a greater burden on our advertising sales department." 153. Under pressure of the substantial losses in advertising revenue which the major women's magazines were suffering at the hands of radio and the growing popularity of Life, the competition in this field became particularly severe during the base period. A determined race for circulation growth began about the middle of 1937 for the petitioner's Woman's Home Companion and its two major competitors, The Ladies' Home Journal and McCall's. There were advertising rate reductions at that time on the part of both these competitors in spite of the increased costs which all three magazines were experiencing by reason of growing circulations and otherwise. The total amount allocated or charged to the Woman's Home Companion for publicity expenses in accordance *329 with the involved system of allocation previously described was $120,591.75 in 1936; increased to $138,924.01 in 1937; moved up to $168,617.53 in 1938; and reached $233,003.62 in 1939. It was then cut back to $119,847.11 in 1940 and to only $78,968.19 in 1941. 154. The following schedule covers the years 1936 to 1945, inclusive, and shows (a) the grand total advertising revenue of all magazines tabulated by the P.I.B. from year to year; (b) the total advertising revenue of all publications included within the preceding item which the P.I.B. classified as women's magazines; (c) the total advertising revenue of the Woman's Home Companion as determined on a consistent basis; (d) the proportion which such revenue for the women's group as a whole was of the grand total; and (e) the proportion which such revenue for the Companion was of the total revenue for the women's group: Comparison of Advertising Revenue
(a)
(b)
(c)
(d)
(e)
Grand Total
Total
Advertising
Percentage
Percentage
Advertising
Advertising
Revenue of
Ratio of
Ratio of
Revenue of
Revenue of
Woman's
Column (b) to
Column (c) to
All P.I.B.
All Women's
Home
Column (a)
Column (b)
Magazines
Magazines
Companion
Year
(in millions)
(in millions)
(in millions)
1936
$154.7
$51.3
$7.1
33.16%
13.84%
1937
173.7
54.6
7.6
31.43
13.92
1938
151.7
47.2
6.7
31.11
14.19
1939
162.1
44.0
6.0
27.14
13.64
1940
178.0
44.6
5.9
25.06
13.23
1941
191.8
46.6
5.9
24.30
12.66
1942
188.9
46.0
5.8
24.35
12.61
1943
247.3
58.7
6.9
23.74
11.75
1944
291.5
74.3
7.6
25.49
10.23
1945
326.9
87.1
7.8
26.64
8.96
*330 155. The International Photoengravers Union, which numbered most of the skilled gravure preparatory workmen among its membership during the base period years and thereafter, required the service of a six-year apprenticeship in gravure preparatory work as a condition to the classification of an individual as a skilled workman entitled to hold a journeyman's card. During the base period years, this union also required people who had obtained a journeyman's card in connection with the preparation of photoengravings for use in the letterpress process to serve a probationary period in gravure preparatory work before they were entitled to receive the top salary scale for gravure work. This probationary period was initially fixed at two years. The very high degree of artistic judgment required for most gravure preparatory work was such that the six-year period of apprenticeship did not always result in the acquisition of the skill necessary to do top quality work. Although this union conducted training schools for gravure apprentices on a continuous basis since about 1916, it is not possible to become a fully skilled gravure workman without extensive commercial practice. While multicolor *331 gravure printing for newspaper supplements became increasingly common after about 1925, there has always been a severe scarcity of people having the necessary interest and aptitude to become competent gravure craftsmen. The number of skilled workmen capable of doing gravure preparatory work has tended to increase substantially over the years, and increased sharply for the petitioner after it entered into a union contract with the Engravers Union effective January 1, 1938, but competent gravure workmen continued to be in very short supply for a long time after the end of the petitioner's base period. The procurement and adequate training of a sufficient number of fully satisfactory gravure workmen still presented a serious problem for the petitioner and other gravure printers as late as 1951. 156. The following schedule shows the total number of gravure preparatory department employees carried on the petitioner's last pay roll for each of the calendar years 1936 to 1941, inclusive, together with a breakdown showing the number of skilled workmen, semi-skilled workmen, trainees, and office employees included therein: Number of Gravure Preparatory Department Employees
Semi-
End of Year
Total
Skilled
skilled
Trainees
Office
1936
26
6
1
19
1937
48
8
13
25
2
1938
62
20
8
32
2
1939
93
34
26
30
3
1940
132
72
36
22
2
1941
148
98
26
22
2
*332 157. The number of persons employed in the gravure preparatory department for the quarterly periods indicated, the percentage of increase over the respective previous quarters, and the variation between the percentage of increase for each quarter, were as follows: Number of
Percentage
Variation
Employees
of Increase
Between
at the End
Over
Percentages of
of Each Quar-
Previous
Increase for
terly Period
Quarter
Each Quarter
1936 1st Quarter
26
2nd Quarter
27
3.85%
3rd Quarter
27
(3.85%)
4th Quarter
26
(3.85)
(3.85)
1937 1st Quarter
31
19.23
23.08
2nd Quarter
33
6.45
(12.78)
3rd Quarter
36
9.09
2.64
4th Quarter
47
30.56
21.47
1938 1st Quarter
51
8.51
(22.05)
2nd Quarter
54
5.88
(2.63)
3rd Quarter
58
7.41
1.53
4th Quarter
60
3.45
(3.96)
1939 1st Quarter
70
16.67
13.22
2nd Quarter
81
15.71
(.96)
3rd Quarter
85
4.94
(10.77)
4th Quarter
90
5.88
.94
Total
133.78%
2.03%
Average
8.92%
.145%
158. Petitioner's press equipment of all kinds has long been depreciated on a straight line basis at a uniform rate of 5 per cent per annum for book purposes, and this same system was *333 also accepted for Federal tax return purposes in all the years pertinent to the present proceeding. The following schedule shows the total depreciation deductions claimed on petitioner's Federal income tax returns for each of the calendar years 1936 to 1941, inclusive, in a parallel column with the cumulative increase over the 1936 level in the amount of such deductions from year to year thereafter: Cumulative
Total
Increase in De-
Deduction for
preciation over
Year
Depreciation
1936 Level
1936
$374,719.35
1937
420,604.96
$ 45,885.61
1938
458,048.18
83,328.83
1939
481,069.27
106,349.92
1940
499,785.90
125,066.55
1941
508,277.42
133,558.07
159. The petitioner's cost of a representative page of advertising material was higher than the cost of printing a representative page of editorial material. This was true in the case of both letterpress and gravure printing, and was primarily attributable to the fact that substantially higher standards of quality were maintained in the case of advertising matter. Such higher standards not only led to the use of more expensive paper and a much greater variety of inks for advertising work, but affected *334 virtually every operation necessary to produce a finished product not only in the petitioner's printing plant in Springfield but also in its home office in New York. The difference in petitioner's printing costs for an editorial page and an advertising page was even more substantial in the case of gravure printing than it was in the case of letterpress printing. In the case of fourcolor work such costs would be at least 20 per cent higher for an advertising page for letterpress printing but would average 40 per cent higher for gravure printing. 160. The average make-ready time for a four-color letterpress press is between 70 and 72 hours. Make-ready time for a four-color gravure press can be as little as 30 minutes, but usually is about 6 hours. The saving in make-ready time to such an extent makes gravure lower in cost than letterpress. 161. The lighter weight of paper used for multicolor gravure printing resulted in a reduction in the cost of issue transportation although not reflected by petitioner in its computation of gravure cost saving. 162. The cost of editorial engravings in letterpress constitutes a printing cost item not reflected by petitioner in its computation of *335 per page letterpress printing costs. 163. There was a cost saving per page of Collier's size per million copies printed in gravure during petitioner's base period. 164. A certified public accountant, employed by the firm engaged in preparing the claims here in question, by the use of book figures and allocations thereof based on his judgment and information relating thereto obtained by him from becoming familiar with the business, its books and operations, computed petitioner's constructive increased net income for each of the base period years and its CABPNI. Those supporting factual figures appearing in the Exhibits relating to all the reconstructions, including section 721 relief, which do not involve an allocation based on judgment, are hereby incorporated by this reference. 165. It has been the petitioner's regular accounting practice for a great many years to defer reporting the income which it receives for advance subscriptions to its magazines until the year in which it actually makes delivery of such magazines. Throughout the base period, however, and for many years prior thereto it treated all of the expenses incurred in procuring such advance subscriptions as a proper *336 charge against income for the year in which such expenses were actually incurred. Upon audit of petitioner's Federal income tax return for the calendar year 1938, the Bureau of Internal Revenue took the position that all deferred subscription expenses should likewise be deferred on the same basis as the corresponding income, and accordingly made an adjustment of the petitioner's net income as initially reported for the year 1938 through the disallowance of deferred subscription expenses in the amount of $440,581. This adjustment was agreed to by the petitioner. 166. In December of 1936 petitioner paid a bonus to its salaried employees and certain other personnel in the amount of one week's salary, with the provision that no individual was to receive more than $100. This bonus amounted to $104,678.50. Petitioner did not pay such a bonus to its employees in any year prior to 1936, nor in any of the years from 1937 through 1945. 167. Under the terms of a voluntary savings and profit-sharing fund which petitioner had established for the benefit of its employees in 1919 and had kept in continuous operation up until its discontinuance in 1935, petitioner contributed the following amounts *337 for the years indicated: Year
Amount
1932
$73,810.44
1933
44,503.71
1934
36,059.87
1935
92,828.98 The bonus actually voted in 1936 was classed as compensation at that time in the sense that the return consideration expected was better employee morale and that the expenditure involved was justified because of its anticipated effect on employee morale and efficiency in the same way as the petitioner's prior contributions under the savings and profit-sharing fund. The imposition of social security taxes was the reason for the discontinuance of the employees' savings and profit-sharing fund. 168. Petitioner incurred expenses for executive bonuses as follows: Year
Amount
1932
0
1933
0
1934
0
1935
0
1936
$123,000.00
1937
115,000.00
1938
0
1942
0
1943
75,500.00
1944
75,800.00
1945
190,300.00
169. The amount of bonus payments which petitioner made to its executive employees in the calendar years 1936 and 1937 was determined in accordance with an executive bonus plan which had been formally adopted in the year 1931 and modified in minor respects in 1936. The plan provided that the "total of the bonus fund of any year shall *338 be based upon a ratio to the cash dividend paid on the Common Stock." The bonuses actually paid to executives in the years 1936 and 1937 were the direct result of the increased earnings which petitioner realized in such years. The terms of the corporate resolutions establishing the executive bonus plan contain repeated references to the bonus payments contemplated thereunder as "extra compensation" or "additional compensation." 170. A part of the engineering survey or report prepared by Ford, Bacon & Davis recites that the data set forth therein with respect to a study of the prospective increases in printing capacity necessary to take care of increased production at an annual rate of 10 per cent above the 1936 level had been used "on instructions from the company." Among various other recommendations made in the report was one that the petitioner should lower the floor of the basement under one of its main factory buildings in order to provide room for housing nine steam-dry letterpresses currently in the process of installation. The report indicates that this recommendation had been made the subject of another preliminary report dated July 9, 1937, and that such building alteration *339 or expansion was already well under way at the time the main report of August 11, 1937, was completed. The latter report further recites that the electrical distribution system for the building in which these nine presses were being erected and which also housed petitioner's gravure "section" did not have sufficient capacity. Such report also pointed out that certain "press leads" to this building were located in the floor being lowered and would, therefore, have to be changed in connection with the excavation work involved. 171. Petitioner incurred an expense in the amount of $30,282.10 during 1938 for moving certain power lines in its plant at Springfield. 172. A memorandum dated November 8, 1943, which was taken from Winger's personal files, attributed the "exceptional" advertising revenue which petitioner received in 1943 "primarily to the large amount of money being spent on war advertising" and further expressed the view that petitioner could be "reasonably sure of the fact that if the war should end in 1944 a large part of this volume would pass out of the picture." A report which Winger made to the petitioner's board of directors at a meeting held on February 27, 1945, included *340 the following statement: "He also advised that through closer control of the sale of our magazines by transferring subscription copies to newsstand sales, cutting down of returns, and through the increase in price on Collier's and Woman's Home Companion, that our circulation income credited to 1945 income was in excess of $5,000,000 more than it would have been at the rates in effect prior to the time of change in prices." 173. Collier's was converted from a weekly to a bi-weekly as of August 1, 1953. 174. A large part of the petitioner's total annual expenditures for circularizing and stationery was made for the primary purpose of stimulating the sale of its magazines and of the advertising contained therein; and this same purpose was the primary reason for a great variety of other expenses which petitioner incurred for advertising and circulation department salaries, general advertising sales solicitation and promotion, posters, free leaflets, weekly style letters, patterns, postage used on circulars and sample copies, telephone and telegraph service, printing, prizes, premiums, publicity, radio station time, youth forums, publication of the previously mentioned brochure on *341 gravure printing, gravure reprints, and the like. 175. The basic report on the Ford, Bacon & Davis engineering survey of petitioner's Springfield plant indicates that the primary reason for having such survey made was the rapid increase which had occurred during 1934, 1935, and 1936 in the total volume of printing being used in petitioner's magazines. Such report recommended several more or less radical changes in production schedules and plant management policies to facilitate handling the increased volume of work on a more efficient basis and thereby reduce operating costs and expenses. The total volume of printing being done in petitioner's Springfield plant increased at a much slower rate in 1937 and then declined from 1937 to 1939 by more than a billion pages. 176. The petitioner filed applications for relief on Treasury Department Form 991 under section 722 of the Internal Revenue Code with respect to each of the calendar years 1943, 1944, and 1945, and also filed claims for refund on Treasury Department Form 843 which claimed benefits under sections 711(b)(1)(J) and (K) and section 721 of the Internal Revenue Code with respect *342 to the calendar years 1943 and 1944, and thereafter filed various amended applications, supplementary statements, and other documents in support of such applications and claims. Ultimate Facts Petitioner's base period discontinuance of Country Home and its base period adoption of multicolor high-speed gravure printing constituted changes in the character of its business within the meaning of section 722(b)(4). Petitioner's base period net income is an inadequate standard of normal earnings because of these changes. Petitioner did not reach by the end of 1939 the earning level it would have reached had it made its multicolor high-speed gravure change two years before it did so. A fair and just amount to represent petitioner's constructive average base period net income is $518,000 in excess of its average base period net income, after adjustments already allowed in the deficiency notice under section 711. Reviewed as to Section 721(a)(2)(C) and Section 722 Issues by the Special Division. Footnotes
*. This figure should be $25,056.↩
1. Adjusted for corrected stipulated conversion figure.↩
2. See footnote 1.↩
1. Name changed from The Crowell Publishing Company to The Crowell-Collier Publishing Company in May 1939. ↩
2. The affiliated companies shown on the consolidated return which P. F. Collier & Son Company filed for the year 1924 were P. F. Collier & Son Distributing Corporation and Reynolds Publishing Company. ↩
3. Includes net loss of P. F. Collier & Son Company and affiliated companies for the period October 18 to December 31, 1925, inclusive. ↩
4. Net loss for period January 1 to October 17, 1925, inclusive. ↩
5. Net income for period January 1 to June 30, 1934, inclusive.↩
1. Share of three major weeklies, Collier's, Life, and Saturday Evening Post. ↩
2. Share of four major women's magazines, Woman's Home Companion, Good Housekeeping, Ladies' Home Journal, and McCall's. ↩
3. Share of three major monthly magazines, American, Cosmopolitan, and Redbook.↩
3. Publisher's Information Bureau, Inc., is currently controlled by a group of leading publishers. P.I.B. data on Magazine Advertising Revenue has been complied on a more or less consistent basis since at least 1915 (Exhibits YYYY and XXXXX).↩